DOE v DEPARTMENT OF CORRECTIONS

Docket Nos. 321013 and 321756. Submitted June 3, 2015, at Lansing. Decided August 25, 2015, at 9:05 a.m. Leave to appeal sought.

Seven men who had been incarcerated in adult prisons as juveniles, each identified as John Doe, brought an action in the Washtenaw Circuit Court against the Department of Corrections, the Governor, and others, claiming that they had been subjected to sexual violence and harassment by adult male prisoners and female prison guards in violation of the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq.*, which prohibits discrimination in public services. Defendants moved for summary disposition, arguing that plaintiffs had failed to comply with MCL 600.5307(2), a provision of the prison litigation reform act (PLRA), MCL 600.5501 *et seq.*, which requires a prisoner bringing a civil action concerning prison conditions to disclose the number of civil actions and appeals that the prisoner previously initiated. Defendants also argued that plaintiffs had failed to state a claim on which relief could be granted under MCR 2.116(C)(8) because the ELCRA had been amended in 1999 to exclude prisons from the definition of "public service" for purposes of the act. The court, Carol Kuhnke, J., denied defendants' motion, ruling that the disclosure requirements in MCL 600.5507 applied only to indigent prisoners and, in a separate order, that the statutory provision excluding prisons as a public service under ELCRA, MCL 37.2301(b), was an unconstitutional violation of prisoners' right to equal protection of the law. Defendants sought leave to appeal the PLRA order in Docket No. 321013 and the ELCRA order in Docket No. 321756. The Court of Appeals denied the applications, and the Supreme Court, in lieu of granting leave to appeal, remanded to the Court of Appeals for consideration as on leave granted. 497 Mich 881 (2014).

The Court of Appeals *held*:

1. In Docket No. 321013, the trial court erred by denying defendants' motion for summary disposition because plaintiffs failed to comply with the requirement in MCL 600.5507(2) that a prisoner who brings a civil action concerning prison conditions must disclose the number of civil actions and appeals that the

prisoner has previously initiated. MCL 600.5507(3) provides that the court must dismiss the action if it finds that the prisoner failed to comply with the disclosure requirements of subsection (2). Although the complaint indicated that two other civil actions between these parties arising out of the events alleged in the complaint had been filed, this disclosure was ambiguous regarding the identities of the parties and did not indicate whether those were the only civil actions that plaintiffs had initiated. Further, although MCL 600.5507(1) pertains to the limitation for when a prisoner may claim indigency in a civil action, there is no language in MCL 600.5507(2) or MCL 600.5507(3) limiting their requirements to prisoners who are indigent. Under MCL 8.4b, the fact that the provision's catch line makes reference to indigency cannot be used to construe the section more broadly or narrowly than the text would indicate. Contrary to plaintiffs' argument, MCL 600.5507(2) is not the mechanism for determining whether a prisoner has brought three or more civil actions that have been dismissed as frivolous, thereby preventing them from claiming indigency under MCL 600.5507(1), because that determination is made according to the procedure set forth in MCL 600.5529. Neither the statute's legislative history nor the absurd-results rule compels a different conclusion. Because MCL 600.5507(3) states that a court shall dismiss a civil action if a prisoner failed to comply with MCL 600.5507(2), plaintiffs were not entitled to amend their complaint.

2. In Docket No. 321756, the trial court erred by denying defendants' motion for summary disposition regarding plaintiffs' claims under the ELCRA. MCL 37.2302(a) provides that except where permitted by law, a person shall not deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status. However, 1999 PA 202 amended the definition of "public service" to indicate that it does not include a state or county correctional facility with respect to actions and decisions regarding an individual serving a sentence of imprisonment. This provision bars plaintiffs' claim. Although a federal district court opinion ruled that this exclusion was an unconstitutional violation of equal protection under the law, that opinion was not binding, did not render the provision void *ab initio*, and did not preclude defendants by collateral estoppel from arguing that 1999 PA 202 was constitutional. The amendment was not facially unconstitutional as violative of equal protection because prisoners are not a suspect class, the amendment does not infringe a protected fundamental right, prisoners and nonprisoners are not

similarly situated, and the amendment was rationally related to the legitimate governmental interest of deterring meritless lawsuits and preserving scarce public resources.

Reversed and remanded for further proceedings.

Judge BECKERING, concurring in part and dissenting in part, concurred with regard to the issue of whether dismissal was required under MCL 600.5507(3) because of binding existing precedent interpreting the PLRA, but respectfully dissented in all other respects. She would have allowed plaintiffs to file an amended complaint in compliance with MCL 600.5507(2) had she not been bound by precedent. She would have affirmed the trial court's declaration that the 1999 amendment of the ELCRA was unconstitutional on the alternative ground that the statutory amendment contravened the clear and express directive given to the Legislature in Const 1963, art 1, § 2 to protect the civil rights of all persons. She would also have held that the amendment was unconstitutional because it failed the rational-basis test. Finally, she would have held that plaintiffs pleaded sufficient claims to survive a motion for summary disposition under MCR 2.116(C)(8).

1. PRISONS AND PRISONERS — CIVIL ACTIONS — DISCLOSURE OF PRIOR CIVIL ACTIONS AND APPEALS — INDIGENCY.

The requirement in MCL 600.5507(2) that a prisoner who brings a civil action concerning prison conditions must disclose the number of civil actions and appeals that the prisoner has previously initiated is not limited to prisoners who are indigent.

2. PRISONS AND PRISONERS — CIVIL ACTIONS — DISCLOSURE OF PRIOR CIVIL ACTIONS AND APPEALS — DISMISSALS — REMEDIES.

MCL 600.5507(3) requires a court to dismiss a civil action brought by a prisoner concerning prison conditions if the prisoner failed to disclose under MCL 600.5507(2) the number of civil actions and appeals that the prisoner has previously initiated; a prisoner who fails to do so is not entitled to amend his or her complaint to comply with MCL 600.5507(2).

3. CONSTITUTIONAL LAW — EQUAL PROTECTION — PRISONS AND PRISONERS — CIVIL RIGHTS ACT — DEFINITIONS — PUBLIC SERVICE.

The amendment of the definition of "public service" in Michigan's Civil Rights Act, MCL 37.2101 *et seq.*, to exclude a state or county correctional facility with respect to actions and decisions regarding an individual serving a sentence of imprisonment was not facially unconstitutional as violative of the right to equal protection (US Const, Am XIV; Const 1963, art 1, § 2; 1999 PA 202).

*Deborah LaBelle, Anlyn Addis, Richard A. Soble,
Jennifer B. Salvatore, Nakisha Chaney, Edward
Macey, Michael L. Pitt, Peggy Goldberg Pitt,* and *Cary
S. McGehee* for plaintiffs in Docket No. 321013.

*Pitt McGehee Palmer & Rivers, PC* (by *Michael L.
Pitt, Beth M. Rivers, Peggy Goldberg Pitt,* and *Cary S.
McGehee*), *Deborah LaBelle* and *Anlyn Addis,* and
*Jennifer B. Salvatore, Nakisha Chaney,* and *Edward
Macey* for plaintiffs in Docket No. 321756.

*Bill Schuette,* Attorney General, *Aaron D. Lind-
strom,* Solicitor General, *Matthew Schneider,* Chief
Legal Counsel, *Ann Sherman,* Assistant Solicitor Gen-
eral, and *Mark E. Donnelly, Michael F. Murphy, Chris-
tina M. Grossi,* and *Heather S. Meingast,* Assistant
Attorneys General, for defendants in Docket No.
321013.

*Bill Schuette,* Attorney General, *Aaron D. Lind-
strom,* Solicitor General, *Matthew Schneider,* Chief
Legal Counsel, *B. Eric Restuccia,* Deputy Solicitor
General, and *Mark E. Donnelly* and *Heather S. Mein-
gast,* Assistant Attorneys General, for defendants in
Docket No. 321756.

Before: RIORDAN, P.J., and DONOFRIO and BECKERING,
JJ.

RIORDAN, P.J. Defendants, various governmental en-
tities and individuals including the Department of
Corrections and the Governor, originally sought leave
to appeal the trial court orders denying their motions
for summary disposition in this action initiated by
plaintiffs, who are male prisoners.

In Docket No. 321013, defendants sought to appeal
the trial court order denying their motion for summary

disposition based on plaintiffs' failure to comply with the prison litigation reform act (PLRA), MCL 600.5501 *et seq.* In Docket No. 321756, defendants sought to appeal the trial court order denying their motion for summary disposition based on the prisoners' substantive discrimination claims.

This Court initially denied defendants' applications for leave to appeal. The Supreme Court, in lieu of granting leave to appeal, remanded the case to this Court for consideration as on leave granted. *Doe v Dep't of Corrections*, 497 Mich 881 (2014). Having reviewed the issues raised on appeal, we reverse and remand for proceedings consistent with this opinion.

## I. BACKGROUND

Plaintiffs are seven unidentified males who became imprisoned while under the age of 18 in Department of Corrections (DOC) facilities. Plaintiffs sued under the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq.*, claiming that they had been subjected to sexual violence and harassment by adult male prisoners and female prison guards.

Defendants eventually moved for summary disposition on several grounds. First, they contended that plaintiffs failed to comply with MCL 600.5507(2), a provision of the PLRA requiring that a prisoner filing a lawsuit concerning prison conditions disclose the number of civil actions and appeals the prisoner previously initiated. Defendants alleged that plaintiffs' disclosure was insufficient. Defendants further argued that, because MCL 600.5507(3) provides that a court "shall" dismiss any action if the prisoner fails to comply with Subsection (2), plaintiffs' complaint had to be dismissed without prejudice. MCR 2.116(C)(4). Plaintiffs countered that MCL 600.5507 only applied to complaints

filed on behalf of indigent prisoners, which did not include the prisoners in this case. The trial court ultimately denied defendants' motion for summary disposition.

Defendants also moved for summary disposition under MCR 2.116(C)(8), contending that plaintiffs failed to state a claim on which relief could be granted because the plain language of the ELCRA, as amended, provides that a "public service" does not include a state or county correctional facility with respect to prisoners. Defendants further argued that the amendment did not violate equal-protection principles. Plaintiffs vigorously disputed this point, arguing that the amendment was unconstitutional because it violated plaintiffs' rights to equal protection of the law, with no legitimate justification. They also highlighted that a federal district court case had found the amendment to be unconstitutional, and that decision was binding on the court.

The crux of plaintiffs' equal-protection argument at this juncture is not based on the allegation that their fundamental right to be free from sexual assault is being violated. Rather, plaintiffs' contention is that the ELCRA violates their right to equal protection because it prohibits them from filing a lawsuit based on their status as prisoners, regardless of the type of claim they seek to assert.

The trial court ultimately denied defendants' motion for summary disposition. It ruled that MCL 37.2301(b), which excluded prisons as places of public services under the ELCRA, was unconstitutional because it violated the Equal Protection Clauses of the Michigan and United States Constitutions. Defendants now appeal.

## II. STANDARDS OF REVIEW

"The interpretation and application of statutes is a question of law that we review de novo." *Ewin v Burnham*, 272 Mich App 253, 255; 728 NW2d 463 (2006).[1] We also review constitutional issues de novo. *Mahaffey v Attorney General*, 222 Mich App 325, 334; 564 NW2d 104 (1997). "Statutes are presumed to be constitutional, and we have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent." *Cadillac Mayor v Blackburn*, 306 Mich App 512, 516; 857 NW2d 529 (2014) (quotation marks and citation omitted). Additionally, we review issues concerning the application of collateral estoppel de novo. *Barrow v Pritchard*, 235 Mich App 478, 480; 597 NW2d 853 (1999).

### III. PRISON LITIGATION REFORM ACT

#### A. DISCLOSURE

The PLRA "sets forth certain requirements that apply when a prisoner brings a civil action concerning prison conditions." *Anderson v Myers*, 268 Mich App 713, 715; 709 NW2d 171 (2005) (quotation marks omitted). A "prisoner" is defined as "a person subject to incarceration, detention, or admission to a prison who is accused of, convicted of, sentenced for, or adjudicated delinquent for violations of state or local law . . . ." MCL 600.5531(e). A "civil action concerning prison

---

[1] To the extent that the parties did not raise the issue of plaintiffs' actual compliance with MCL 600.5507(2), we nevertheless address this issue because all the facts necessary for a decision regarding this section are before us and resolving the issue primarily is a question of law. *Nuculovic v Hill*, 287 Mich App 58, 63; 783 NW2d 124 (2010). The same is true of the trial court's failure to fully articulate its finding regarding whether it was bound by a federal district court opinion.

conditions" is defined as "any civil proceeding seeking damages or equitable relief arising with respect to any conditions of confinement or the effects of an act or omission of government officials, employees, or agents in the performance of their duties . . . ." MCL 600.5531(a). Plaintiffs do not dispute that each one of them is a "prisoner" and that the present case is a "civil action concerning prison conditions." Nor do the parties dispute that plaintiffs are not indigent.

MCL 600.5507, the provision in dispute, provides:

(1) A prisoner shall not claim indigency under [MCL 600.2963][2] in a civil action concerning prison conditions or an appeal of a judgment in a civil action concerning prison conditions or be allowed legal representation by an attorney who is directly or indirectly compensated for his or her services in whole or in part by state funds if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any prison, brought an action or appeal in a court of this state that was dismissed on the grounds that it was frivolous, unless the prisoner has suffered serious physical injury or is under imminent danger of suffering serious physical injury or has suffered or is under imminent danger of suffering conduct prohibited under . . . MCL 750.520b, 750.520c, 750.520d, 750.520e, and 750.520g.

(2) A prisoner who brings a civil action or appeals a judgment concerning prison conditions shall, upon commencement of the action or initiation of the appeal, disclose the number of civil actions and appeals that the prisoner has previously initiated.

(3) The court shall dismiss a civil action or appeal at any time, regardless of any filing fee that may have been paid, if the court finds any of the following:

(a) The prisoner's claim of injury or of imminent danger under subsection (1) is false.

---

[2] MCL 600.2963 deals more specifically with prisoners initiating civil suits.

(b) The prisoner fails to comply with the disclosure requirements of subsection (2).

The primary goal of statutory interpretation is to ascertain and give effect to the intent of the Legislature. *Mich Ed Ass'n v Secretary of State (On Rehearing)*, 489 Mich 194, 217; 801 NW2d 35 (2011). "The first criterion in determining intent is the language of the statute. If the statutory language is clear and unambiguous, judicial construction is neither required nor permitted, and courts must apply the statute as written." *Tevis v Amex Assurance Co*, 283 Mich App 76, 81; 770 NW2d 16 (2009). "Courts may not speculate regarding legislative intent beyond the words expressed in a statute. . . . Unless defined in the statute, every word or phrase should be accorded its plain and ordinary meaning, taking into account the context in which the words are used." *Chico-Polo v Dep't of Corrections*, 299 Mich App 193, 198; 829 NW2d 314 (2013) (quotation marks and citations omitted). We also presume every word in a statute has meaning, and avoid construing the statute in a way that would render any part surplusage or nugatory. *Griswold Props, LLC v Lexington Ins Co*, 276 Mich App 551, 565; 741 NW2d 549 (2007). Furthermore, "[a] provision in a statute is ambiguous only if it irreconcilably conflicts with another provision, or when it is *equally* susceptible to more than a single meaning." *Alvan Motor Freight, Inc v Dep't of Treasury*, 281 Mich App 35, 39-40; 761 NW2d 269 (2008) (quotation marks and citation omitted).

When filing this action, plaintiffs disclosed the following in their complaint:

A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in this court, where it

was given docket number 13-1049-CZ and was assigned to Judge Kuhnke. The action is no longer pending.

In addition, a civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in the Eastern District of Michigan and was assigned to Judge Cleland. The action remains pending.

There are several deficiencies in plaintiffs' disclosures. First, Subsection (2) requires a prisoner to "disclose the number of civil actions and appeals that *the prisoner* has previously initiated." (Emphasis added). The language in plaintiffs' complaint is that there were civil actions "between *these parties or other parties* arising out of the transaction or occurrence alleged in the complaint."[3] This disclosure is ambiguous regarding the identities of the parties in the previous litigation, and leaves to speculation whether it was "the prisoner[s]" from this case as a full group, partial group, or individually.

Second, Subsection (2) requires disclosure of "the number of civil actions and appeals that the prisoner has *previously initiated*." MCL 600.5507(2) (emphasis added). Even assuming that plaintiffs initiated the two previously filed civil actions, their disclosure did not indicate whether those were the only civil actions and appeals they previously initiated as a group or individually. Instead, they disclosed only two previously filed actions "arising out of the transaction or occurrence alleged in the complaint." Yet the plain language of Subsection (2) requires that a prisoner "shall . . . disclose the number of civil actions and appeals that the prisoner has previously initiated." MCL 600.5507(2). There is no limiting language that prisoners only should disclose civil actions arising out of

---

[3] Ostensibly, this was an attempt to comply with MCR 2.113(C)(2).

the transaction at issue in the present complaint. Here, plaintiffs' disclosure left open the possibility that any of the plaintiffs initiated civil actions or appeals concerning prison conditions that did not arise out of the transaction or occurrence alleged in the complaint. Further, "[t]he statute does not predicate the disclosure requirement upon the prisoner having, in fact, previously filed civil actions or appeals." *Tomzek v Dep't of Corrections*, 258 Mich App 222, 224; 672 NW2d 511 (2003). So, even if plaintiffs had not initiated any other civil suits, the deficiency in their disclosure statement would not have been cured.

Accordingly, we reject any contention that plaintiffs' complaint complied with Subsection (2) of MCL 600.5507.

### B. INDIGENCY

We now turn to plaintiffs' argument under the PLRA, namely, that Subsection (2) does not apply to nonindigent prisoners. We conclude that it does.

Subsection (2) provides, "A prisoner who brings a civil action . . . concerning prison conditions shall . . . disclose the number of civil actions . . . that the prisoner has previously initiated." MCL 600.5507(2) (emphasis added). The words "the" and "a" have different meanings. *Massey v Mandell*, 462 Mich 375, 382 n 5; 614 NW2d 70 (2000). " 'The' is defined as 'definite article. 1. (used, [especially] before a noun, with a specifying or particularizing effect, as opposed to the indefinite or generalizing force of the indefinite article a or an).' " *Robinson v Lansing*, 486 Mich 1, 14; 782 NW2d 171 (2010) (citations omitted).

Subsection (2) employs the word "a" to describe the class of prisoners who must disclose the number of civil actions previously filed. As defined earlier, "a" has no

specifying or particularizing effect. Thus, the plain language of Subsection (2) indicates that it applies to prisoners, without limitation to indigent prisoners. Indeed, plaintiffs acknowledge that Subsection (2) does not expressly limit the requirement to indigent prisoners. Because the statute is unambiguous, we are mindful that nothing may be read into it. *Tevis*, 283 Mich App at 81.

Nevertheless, as plaintiffs point out, it is true that a statutory provision cannot be read in isolation. *Robinson*, 486 Mich at 15. See *Hines v Volkswagen of America, Inc*, 265 Mich App 432, 438; 695 NW2d 84 (2005) ("Although a phrase or a statement may mean one thing when read in isolation, it may mean something substantially different when read in context.") (quotation marks and citation omitted). However, the remaining language of MCL 600.5507 does not indicate that Subsection (2) applies only to indigent prisoners.[4]

Subsection (1) pertains to the limitation on when a prisoner may claim indigency in a civil action under MCL 600.2963.[5] However, the Legislature employed no language in Subsections (2) or (3) limiting their requirements to prisoners who are indigent, or to those listed in Subsection (1). Plaintiffs urge this Court to look at legislative history and the editorially supplied catchline of MCLA 600.5507, which states, "Claim of indigency in civil actions concerning prison conditions, prohibitions." See also MCLS 600.5507 ("Claim of indigency; limitations; exceptions . . . .") and Public

---

[4] Although plaintiffs attempt to draw an inference from federal law, namely 28 USC 1915, regarding proceedings *in forma pauperis*, nothing in that statute is similar to MCL 600.5507(2) and the language regarding disclosure.

[5] MCL 600.2963 deals more specifically with prisoners filing civil actions.

and Local Acts of 1999, p 978 ("Claim of indigency; limitations . . . ."). "However, the catch line of a statute is not part of the statute itself, and should not be used to construe the section more broadly or narrowly than the text of the section would indicate." *People v Mitchell*, 301 Mich App 282, 292; 835 NW2d 615 (2013). MCL 8.4b provides:

> The catch line heading of any section of the statutes that follows the act section number shall in no way be deemed to be a part of the section or the statute, or be used to construe the section more broadly or narrowly than the text of the section would indicate, but shall be deemed to be inserted for purposes of convenience to persons using publications of the statutes.

We also decline to rely upon legislative history. Legislative intent is discerned from the words of the statute itself as that is what was enacted into law. *Chico-Polo*, 299 Mich App at 198. Furthermore, our interpretation of the statute "ensures that it works in harmony with the entire statutory scheme." *Potter v McLeary*, 484 Mich 397, 411; 774 NW2d 1 (2009), and *Bush v Shabahang*, 484 Mich 156, 167; 772 NW2d 272 (2009); see also *Slater v Ann Arbor Pub Sch Bd of Ed*, 250 Mich App 419, 429; 648 NW2d 205 (2002). Our interpretation is consistent with the underlying purpose of the PLRA, which is to manage the overall number of suits prisoners initiate. See, e.g., MCL 600.5503(1) (prohibiting a prisoner from filing an action concerning prison conditions unless the prisoner has exhausted all available administrative remedies); MCL 600.5503(3) (prohibiting courts from appointing counsel paid for in whole or in part at taxpayer expense to a prisoner for the purpose of filing an action concerning prison conditions); MCL 600.5505(1) and (2) (stating that MCL 600.2963 applies to civil actions concerning prison conditions and requiring courts to

dismiss a case at any time for several reasons); MCL 600.5509 (stating that a court shall review as soon as practicable a civil complaint in which a prisoner seeks redress from a governmental entity and requiring the court to dismiss the action if the complaint is frivolous or seeks monetary relief from a defendant who is immune from the requested relief).

Plaintiffs, however, advance an alternative interpretation of the statute. As discussed, Subsection (1) generally prohibits a prisoner from claiming indigency under MCL 600.2963 if the prisoner has, on three or more occasions, while incarcerated or detained in any prison, brought an action that was dismissed because it was frivolous. Plaintiffs contend that Subsection (2) is the mechanism for determining whether a prisoner has brought three or more civil actions that have been dismissed as frivolous, thereby preventing them from claiming indigency under Subsection (1).

Yet plaintiffs fail to address MCL 600.5529, which provides:

> (1) The state court administrative office shall compile and maintain a list of the civil actions concerning prison conditions brought by a prisoner that are dismissed as frivolous. The list shall include an account of the amount of unpaid fees and costs associated with each dismissed case. *The list shall be made available to the courts of this state for the purpose of ascertaining the existence and number of civil actions concerning prison conditions filed by each prisoner,* and any associated unpaid fees and costs, for the purposes described in this chapter.

> (2) *A court in which a civil action concerning prison conditions is brought shall refer to the list described in subsection (1) to determine the number and existence of civil actions concerning prison conditions previously filed by a prisoner* and any associated unpaid fees and costs. [Emphasis added.]

Thus, pursuant to MCL 600.5529, a court determines whether claims have been dismissed because of frivolity by consulting the list that the State Court Administrative Office compiles and maintains. The court does not perform this function on the basis of a prisoner's disclosures under Subsection (2). In fact, Subsection (2) does not require a prisoner to disclose how many of the civil actions and appeals were dismissed because they were *frivolous*. Rather, it only requires a prisoner to "disclose the number of civil actions and appeals that the prisoner has previously initiated." Because the disclosure required by Subsection (2) is not limited to previous civil actions and appeals that were dismissed as frivolous, plaintiffs' argument fails.

Plaintiffs also rely on the rule of statutory construction known as the "absurd-results rule." See *Detroit Int'l Bridge Co v Commodities Export Co*, 279 Mich App 662, 674; 760 NW2d 565 (2008). Under this rule, "a statute should be construed to avoid absurd results that are manifestly inconsistent with legislative intent[.]" *Id.* (quotation marks and citation omitted). In other words, "a statute need not be applied literally if no reasonable lawmaker could have conceived of the ensuing result." *Id.* at 675. Plaintiffs assert that absent a relationship between Subsections (1) and (2), the disclosure required by Subsection (2) serves no purpose. However, the premise of plaintiffs' argument is that the disclosure requirement in Subsection (2) serves the purpose of determining whether a prisoner may claim indigency. Yet, as explained earlier, plaintiffs are not required to disclose how many of the previous cases were dismissed based on frivolity. Therefore, we reject plaintiffs' argument based on the absurd-results rule.

Furthermore, "[t]he wisdom of a statute is for the determination of the Legislature and the law must be enforced as written." *Gilliam v Hi-Temp Prod Inc*, 260 Mich App 98, 109; 677 NW2d 856 (2003). "The fact that a statute appears to be impolitic, unwise, or unfair is not sufficient to permit judicial construction." *Id.*

Thus, we conclude that the disclosure requirement in MCL 600.5507(2) unambiguously applies to all prisoners, not only those claiming indigency.

### C. REMEDY

Alternatively, plaintiffs contend that the proper remedy for noncompliance with the disclosure requirements is a remand to permit them to amend the complaint, rather than dismissal. We disagree.

Pursuant to MCL 600.5507(3)(b), "[t]he court shall dismiss a civil action or appeal at any time, regardless of any filing fee that may have been paid, if the court finds" that the "prisoner fails to comply with the disclosure requirements of subsection (2)." Despite this clear directive, plaintiffs contend that they should have been permitted to amend their complaint. See MCR 2.118(A)(2) ("Except as provided in subrule (A)(1), a party may amend a pleading only by leave of the court or by written consent of the adverse party. Leave shall be freely given when justice so requires."). Defendants, however, posit that Subsection (3) precludes amendment of the complaint because that provision states that the court *shall* dismiss a civil action if the prisoner fails to comply with Subsection (2) of the statute.

The word "shall" is unambiguous and denotes "a mandatory, rather than discretionary action." *Roberts v Mecosta Co Gen Hosp*, 466 Mich 57, 65; 642 NW2d 663 (2002). Consistently with the plain language of the

statute, in *Tomzek*, 258 Mich App at 223, we held "that the statutory language mandates dismissal of the appeal, without regard to how or when the issue was raised." We also recognized that the failure to disclose the number of previous civil actions or appeals was fatal, even if that number was zero. *Id.* at 224-225. Likewise, in *Komejan v Dep't of Corrections*, 270 Mich App 398, 399-400; 715 NW2d 375 (2006), we held as follows:

> If a prisoner fails to disclose the number of previous suits, the statute explicitly instructs the court to dismiss the action. MCL 600.5507(3)(b). Plaintiff did not disclose the number of civil actions relating to prison conditions that he had previously pursued, so the trial court should have dismissed this suit. The fact that plaintiff had never pursued a civil action before does not excuse his lack of disclosure because a prisoner is obligated to disclose the number of civil actions and appeals he had previously initiated, even when that number is zero. Plaintiff's failure to disclose the number of previous civil actions he commenced mandates the dismissal of this case. [Quotation marks, ellipsis, and citation omitted.]

Relying on federal caselaw, plaintiffs claim they should be given the opportunity to amend the complaint. However, the federal decisions it cites are not binding on this Court. *State Treasurer v Sprague*, 284 Mich App 235, 241; 772 NW2d 452 (2009). Plaintiffs also cite MCL 600.2301, which provides:

> The court in which any action or proceeding is pending, has power to amend any process, pleading or proceeding in such action or proceeding, either in form or substance, for the furtherance of justice, on such terms as are just, at any time before judgment rendered therein. The court at every stage of the action or proceeding shall disregard any error or defect in the proceedings which do not affect the substantial rights of the parties.

The applicability of MCL 600.2301 rests on a two-pronged test: (1) whether a substantial right of a party is implicated, and (2) whether a cure is in furtherance of justice. *Bush*, 484 Mich at 177. Plaintiffs make no argument regarding either prong of this test. *Ypsilanti Charter Twp v Kircher*, 281 Mich App 251, 287; 761 NW2d 761 (2008) (stating that a party's failure to properly address the merits of an assertion of error constitutes an abandonment of the issue on appeal).

Furthermore, plaintiffs' contention is contrary to a cardinal rule of statutory interpretation: "If the language employed by the Legislature is unambiguous, the Legislature is presumed to have intended the meaning clearly expressed, and this Court must enforce the statute as written." *Ameritech Pub, Inc v Dep't of Treasury*, 281 Mich App 132, 136; 761 NW2d 470 (2008). The language of MCL 600.5507(3) is unambiguous. Consistent with our prior, published caselaw, we apply the statute as written and hold that dismissal is mandated.

Because a plaintiff would be precluded by statute from going forward with this lawsuit, ordinarily we would need not address plaintiffs' additional claims. But, because it is not clear whether any of the John Doe plaintiffs would be free, individually, in the future to bring the claims they now allege under the ELCRA and Equal Protection Clauses, we will consider them here. Further, the Michigan Supreme Court specifically remanded this case for consideration of the issues raised on leave granted. *Doe*, 497 Mich at 881.

IV. ELLIOTT-LARSEN CIVIL RIGHTS ACT

A. BACKGROUND LAW

Defendants contend that the trial court erred by denying their second motion for summary disposition

regarding plaintiffs' substantive claims based on the
ELCRA. Primarily, defendants argue that the amend-
ment to the ELCRA, which excluded prisoner lawsuits,
is not a violation of equal protections.

The ELCRA provides:

> The opportunity to obtain employment, housing and
> other real estate, and the full and equal utilization of
> public accommodations, public service, and educational
> facilities without discrimination because of religion, race,
> color, national origin, age, sex, height, weight, familial
> status, or marital status as prohibited by this act, is
> recognized and declared to be a civil right. [MCL
> 37.2102(1).]

The statute further provides that "[e]xcept where per-
mitted by law, a person shall not . . . [d]eny an indi-
vidual the full and equal enjoyment of the goods,
services, facilities, privileges, advantages, or accommo-
dations of a place of public accommodation or public
service because of religion, race, color, national origin,
age, sex, or marital status." MCL 37.2302(a).

In *Neal v Dep't of Corrections (On Rehearing)*, 232
Mich App 730, 735-737; 592 NW2d 370 (1998), we
held that prisons are places of "public service" under
the ELCRA, so that discrimination against inmates is
prohibited. However, the Legislature then passed
1999 PA 202,[6] which amended the definition of "public
service" in the ELCRA. "Public service" now is defined
as

> a public facility, department, agency, board, or commis-
> sion, owned, operated, or managed by or on behalf of the
> state, a political subdivision, or an agency thereof or a tax
> exempt private agency established to provide service to
> the public, *except that public service does not include a*

---

[6] Although not effective until 2000, this will be referred to as the 1999
amendment.

*state or county correctional facility with respect to actions and decisions regarding an individual serving a sentence of imprisonment.* [MCL 37.2301(b) (emphasis added).]

The amendment was

curative and intended to correct any misinterpretation of legislative intent in the court of appeals decision <u>Neal</u> v <u>Department of Corrections</u>, 232 Mich App 730 (1998). This legislation further expresses the original intent of the legislature that an individual serving a sentence of imprisonment in a state or county correctional facility is not within the purview of this act. [1999 PA 202, enacting § 1.]

On appeal, the parties do not dispute that the 1999 amendment's definition of "public service" bars the prisoners' lawsuit under the ELCRA. Instead, plaintiffs attack the amendment directly, arguing that it violates their equal protection rights.

Plaintiffs also contend that a federal district court case, *Mason v Granholm*, unpublished opinion of the United States District Court for the Eastern District of Michigan, issued January 23, 2007 (Docket No. 05-73943), precludes defendants from arguing otherwise. In *Mason*, virtually no factual background regarding the plaintiffs or the case was provided in the court's opinion. The court briefly summarized *Romer v Evans*, 517 US 620, 633; 116 S Ct 1620; 134 L Ed 2d 855 (1996), finding it to be an example of when the "Supreme Court struck down an amendment to the Colorado Constitution that prohibited legislative, executive, or judicial action at any level of state or local government designed to protect gays and lesbians."[7] The *Mason* court then opined:

---

[7] Unlike Amendment 2 to the Colorado Constitution in *Romer*, which prohibited any governmental action designed to protect homosexuals, here the 1999 Amendment does not make it more difficult for prisoners to seek aid from the government. More importantly, the 1999 Amendment does not preclude prisoners from asking the government for

The MDOC does not argue that the ELCRA amendment advances legitimate penological interests, such as maintaining prison order. Rather, the MDOC contends that the ELCRA amendment does advance legitimate interests such as protecting the public fisc, preventing windfall awards, reducing judicial intervention in the management of prisons, deterring frivolous lawsuits by prisoners and reducing trivial or inconsequential suits. In support of its argument that the ELCRA amendment is constitutional, MDOC cites to several Sixth Circuit cases upholding challenges to the federal Prison Litigation Reform Act [PLRA], which placed some restrictions on prisoners' ability to file civil rights claims.

\* \* \*

In contrast to the PLRA provisions upheld in . . . other cases, the ELCRA amendment paints with a much broader brush. Rather than placing some limits on prisoner litigation and deterring frivolous suits, the ELCRA amendment completely precludes prisoners from challenging the conditions of their confinement or the discriminatory practices of the MDOC under the ELCRA, while they are incarcerated or after their release, and whether their claims are meritorious or not. The amendment does not, like the PLRA amendments, essentially place prisoners in the same position with respect to filing suit as other citizens. Rather, the amendment forecloses the vindication of prisoners' equal protection rights under Michigan law.

Viewing the statute in the context of this case, the ELCRA amendment essentially permits the state to discriminate against female prisoners without fear of accountability under Michigan's civil rights law. Given the state's abhorrent and well-documented history of sexual and other abuse of female prisoners, the court finds this amendment particularly troubling. It appears that the

---

protection from discrimination. It only prohibits prisoners from filing a lawsuit under the ELCRA and seeking damages.

state legislature has not attempted to deter frivolous lawsuits, but rather preclude meritorious ones.

Moreover, while deterring frivolous suits and protecting the public treasury are legitimate government interests, the ELCRA amendment is too broad to be rationally related to these interests. The ELCRA amendment denies prisoners the basic protections against discrimination that all others are afforded under Michigan law, *as required by* Article I, Section Two of the Michigan Constitution, which provides that "The legislature shall implement this section by appropriate legislation." There is no rational basis for denying *all* prisoners (including those who have been released) — and no one else — the ability to seek redress for illegal discrimination that occurred in prison. As the Romer court explained, "[a] law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense."

Accordingly, the court concludes that the ELCRA amendment violates prisoners' equal protection rights and is unconstitutional. [*Mason,* unpub op at 5-8 (citations and quotation marks omitted).]

On appeal, both parties contest the effect *Mason* should have on this case and this Court. For the following reasons, we conclude that *Mason* is not binding.

### B. FEDERAL COURT DECISIONS

"Although state courts are bound by the decisions of the United States Supreme Court construing federal law, there is no similar obligation with respect to decisions of the lower federal courts." *Abela v Gen Motors Corp,* 469 Mich 603, 606; 677 NW2d 325 (2004) (citation omitted). In other words, while "lower federal court decisions may be persuasive, they are not binding on state courts." *Id.* at 607. Thus, we

reject any argument that we are required to find that the 1999 amendment to the ELCRA violates equal protection simply because a federal district judge in a limited, unpublished opinion came to that conclusion.

Plaintiffs nevertheless argue that a statute declared unconstitutional is void *ab initio*. *Stranton v Lloyd Hammond Produce Farms*, 400 Mich 135, 144; 253 NW2d 114 (1977). See also *Norton v Shelby Co*, 118 US 425, 442; 6 S Ct 1121; 30 L Ed 178 (1886) ("An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed."). Relying on this rule, plaintiffs contend that because the 1999 amendment was declared unconstitutional in *Mason*, it cannot be enforced against them. However, plaintiffs fail to recognize that the courts of this state have equal responsibility to protect litigants' constitutional rights, *Steffel v Thompson*, 415 US 452, 460-461; 94 S Ct 1209; 39 L Ed 2d 505 (1974), and that state courts are not bound by decisions of lower federal courts, *Johnson v Williams*, 568 US ___; 133 S Ct 1088, 1098; 185 L Ed 2d 105 (2013); *Abela*, 469 Mich at 606.[8]

### C. PRECLUSION

#### 1. BACKGROUND LAW

Plaintiffs next contend that even if the federal district court opinion in *Mason* was not itself binding, the court's determination nevertheless has preclusive

---

[8] Although plaintiffs rely on *Dascola v Ann Arbor*, 22 F Supp 3d 736 (ED Mich, 2014), that case is inapposite. In *Dascola*, the issue was not whether the previous federal ruling prevented the defendants from arguing, in state court, that the statute was constitutional.

effect on defendants because of collateral estoppel.[9] "The preclusive effect of a federal-court judgment is determined by federal common law." *Taylor v Sturgell*, 553 US 880, 891; 128 S Ct 2161; 171 L Ed 2d 155 (2008). See also *Pierson Sand & Gravel, Inc v Keeler Brass Co*, 460 Mich 372, 381; 596 NW2d 153 (1999) ("The state courts must apply federal claim-preclusion law in determining the preclusive effect of a prior federal judgment.") (quotation marks and citation omitted). "Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v McCurry*, 449 US 90, 94; 101 S Ct 411; 66 L Ed 2d 308 (1980).

The application of collateral estoppel is conditioned on the fulfillment of four requirements:

> (1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding; (2) determination of the issue must have been necessary to the outcome of the prior proceeding; (3) the prior proceeding must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding. [*Hamilton's Bogarts, Inc v Michigan*, 501 F3d 644, 650 (CA 6, 2007) (quotation marks and citation omitted).]

---

[9] We find no merit to defendants' initial argument that the United States Court of Appeals for the Sixth Circuit in *Mason* held that the federal district court's decision had no preclusive effect in subsequent lawsuits. The issue before the Sixth Circuit in that matter was whether the defendants were entitled, at that point in time, to appeal the federal district court's decision. As stated in the Sixth Circuit's order, it considered and rejected the defendants' argument that the *Mason* decision "permanently enjoins the State Defendants from raising a valid defense to this lawsuit and in subsequent lawsuits" in light of the standards for granting an interlocutory appeal.

Although mutuality originally was a requirement, federal courts have

> allowed a litigant who was not a party to a federal case to use collateral estoppel "offensively" in a new federal suit against the party who lost on the decided issue in the first case[.] But one general limitation the Court has repeatedly recognized is that the concept of collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a "full and fair opportunity" to litigate that issue in the earlier case. [*Allen*, 449 US at 94-95.]

See also *Laborers' Pension Trust Fund Detroit & Vicinity v Lange*, 825 F Supp 171, 175-176 (ED Mich, 1993); *In re Air Crash at Detroit Metro Airport, Detroit, Mich on Aug 16, 1987*, 776 F Supp 316, 322 (ED Mich, 1991).

In the present case, plaintiffs seek to use offensive collateral estoppel, which occurs when "a plaintiff [seeks] to estop a defendant from relitigating the issues which the defendant previously litigated and lost against another plaintiff." *Parklane Hosiery Co, Inc v Shore*, 439 US 322, 329; 99 S Ct 645; 58 L Ed 2d 552 (1979). Trial courts have broad discretion to determine whether to permit the use of offensive collateral estoppel. *Id*. at 331. "The general rule should be that in cases where a plaintiff could easily have joined in the earlier action or where, either for the reasons discussed above or for other reasons, the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel." *Id*.

### 2. UNMIXED QUESTIONS OF LAW

Defendants contend that the exception to collateral estoppel for "unmixed questions of law in successive actions involving substantially unrelated claims" ap-

plies in this case. *Montana v United States*, 440 US
147, 162; 99 S Ct 970; 59 L Ed 2d 210 (1979) (quotation
marks omitted).[10]

The United States Supreme Court has explained the
exception as the following:

> Where, for example, a court in deciding a case has
> enunciated a rule of law, the parties in a subsequent
> action *upon a different demand* are not estopped from
> insisting that the law is otherwise, merely because the
> parties are the same in both cases. But a *fact, question* or
> *right* distinctly adjudged in the original action cannot be
> disputed in a subsequent action, even though the deter-
> mination was reached upon an erroneous view or by an
> erroneous application of the law.

> Thus, when issues of law arise in successive actions
> involving unrelated subject matter, preclusion may be
> inappropriate. [*Id.* (quotation marks and citation omit-
> ted).]

Further, "[t]his exception is of particular importance
in constitutional adjudication. Unreflective invocation
of collateral estoppel against parties with an ongoing
interest in constitutional issues could freeze doctrine

---

[10] Defendants also raise several unpersuasive reasons for why collat-
eral estoppel is not applicable in this case. For example, they contend
that the defendants in *Mason* lacked incentive to litigate the constitu-
tionality of the 1999 amendment. According to the United States
Supreme Court, "[i]f a defendant in the first action is sued for small or
nominal damages, he may have little incentive to defend vigorously,
particularly if future suits are not foreseeable." *Parklane*, 439 US at 330.
Yet, in seeking a stay from the district court's order, defendants argued
that an untold number of lawsuits would result. Thus, defendants
appeared cognizant of the stakes in *Mason*. Moreover, most of defen-
dants' arguments rest on their attempt to characterize this as an issue
regarding the authority of state courts to decide issues. That is a
different issue than collateral estoppel; collateral estoppel is concerned
with whether a party should have a second chance to litigate an issue.
See *Parklane Hosiery Co*, 439 US at 326-327.

in areas of the law where responsiveness to changing patterns of conduct or social mores is critical." *Id.* at 162-163.

But plaintiffs argue that this exception does not apply here because rather than an "unrelated subject matter," the subject matter in *Mason* and the present case is identical. We agree that the legal issue is identical, although because of the scarcity of facts presented in the *Mason* decision, it is difficult to discern the degree of factual similarity in the two cases. While one difference appears to be that the prisoners in *Mason* were females, as the Court explained in *United States v Stauffer Chem Co*, 464 US 165, 172; 104 S Ct 575; 78 L Ed 2d 388 (1984), factual differences must be of legal significance. Any factual differences between *Mason* and the present case do not appear to be legally significant regarding whether the 1999 amendment is constitutional.

However, in *Pharm Care Mgt Ass'n v Dist of Columbia*, 522 F3d 443, 446; 380 US App DC 418 (2008), the court observed that "[l]ess is required for the exception to apply in a case of non-mutual estoppel—such as this case." The court explained that "[i]n a non-mutual case, an issue is *not* precluded if it is one of law and treating it as conclusively determined would inappropriately foreclose opportunities for obtaining reconsideration of the legal rule upon which it was based." *Id.* at 446-447 (quotation marks and citations omitted). The federal court explained that applying collateral estoppel in such an instance would "freeze the development of the law in an area of substantial public interest." *Id.* at 447.

We find this reasoning to be persuasive. The issue of whether prisoners can sue for relief under the ELCRA, which is a pure legal question, is one of substantial

public interest. It also requires courts to venture into the hallowed domain of constitutional law. Applying collateral estoppel in the present case, because one federal district court—in an unpublished case—ruled that the 1999 amendment was unconstitutional, would freeze this area of law prematurely and improperly.

### 3. STATE AS A PARTY

Also relevant is that defendants are state actors. In *United States v Mendoza*, 464 US 154, 158, 162; 104 S Ct 568; 78 L Ed 2d 379 (1984), the United States Supreme Court held that nonmutual offensive collateral estoppel cannot be used against the federal government. It explained its reasoning as follows:

> We have long recognized that the Government is not in a position identical to that of a private litigant, both because of the geographic breadth of Government litigation and also, most importantly, because of the nature of the issues the Government litigates. It is not open to serious dispute that the Government is a party to a far greater number of cases on a nationwide basis than even the most litigious private entity .... Government litigation frequently involves legal questions of substantial public importance; indeed, because the proscriptions of the United States Constitution are so generally directed at governmental action, many constitutional questions can arise only in the context of litigation to which the Government is a party. Because of those facts the Government is more likely than any private party to be involved in lawsuits against different parties which nonetheless involve the same legal issues.

> A rule allowing nonmutual collateral estoppel against the Government in such cases would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue. Allowing only one final adjudication would deprive this Court of the benefit it receives from permitting several

courts of appeals to explore a difficult question before this Court grants certiorari. Indeed, if nonmutual estoppel were routinely applied against the Government, this Court would have to revise its practice of waiting for a conflict to develop before granting the Government's petitions for certiorari.

The Solicitor General's policy for determining when to appeal an adverse decision would also require substantial revision. The Court of Appeals faulted the Government in this case for failing to appeal a decision that it now contends is erroneous. But the Government's litigation conduct in a case is apt to differ from that of a private litigant. Unlike a private litigant who generally does not forgo an appeal if he believes that he can prevail, the Solicitor General considers a variety of factors, such as the limited resources of the Government and the crowded dockets of the courts, before authorizing an appeal. The application of nonmutual estoppel against the Government would force the Solicitor General to abandon those prudential concerns and to appeal every adverse decision in order to avoid foreclosing further review.

In addition to those institutional concerns traditionally considered by the Solicitor General, the panoply of important public issues raised in governmental litigation may quite properly lead successive administrations of the Executive Branch to take differing positions with respect to the resolution of a particular issue. While the Executive Branch must of course defer to the Judicial Branch for final resolution of questions of constitutional law, the former nonetheless controls the progress of Government litigation through the federal courts. It would be idle to pretend that the conduct of Government litigation in all its myriad features, from the decision to file a complaint in the United States district court to the decision to petition for certiorari to review a judgment of the court of appeals, is a wholly mechanical procedure which involves no policy choices whatever. [*Id.* at 159-161.]

Defendants reason that, as nonmutual offensive collateral estoppel cannot be used against the federal

government, it likewise should not be applied against
state governments. Although some federal circuits
have found that states are unlike the federal govern-
ment, and therefore the reasoning of *Mendoza* does not
apply, see *Benjamin v Coughlin*, 905 F2d 571, 576 (CA
2, 1990), we disagree. Instead, we find federal cases
applying this rule to state courts to be more persuasive
and, therefore, we will follow them.

For example, in *In re Complaint of Hercules Carri-
ers, Inc*, 768 F2d 1558, 1579 (CA 11, 1985), the Elev-
enth Circuit held "that the rationale outlined by the
Supreme Court in *Mendoza* for not applying nonmu-
tual collateral estoppel against the government is
equally applicable to state governments." The court
reasoned that *Mendoza* did not differentiate between
the interests of the federal government and state
government, nor was there anything in *Mendoza* to
suggest that the concerns expressed by the court were
"peculiar to the federal government." *Id*.[11] Likewise, in
*Idaho Potato Comm v G&T Terminal Packaging, Inc*,
425 F3d 708, 714 (CA 9, 2005), the Ninth Circuit held
that the rationale in *Mendoza* applied to state govern-
ments.[12]

Like the federal government, state governments are
subject to suit at a frequency that even the most

[11] Although plaintiffs focus on the fact that the court in *Hercules* noted
that the case involved different state agencies, that was only one
additional reason the court provided. Further, we note that all the
defendants in this case do not appear to be identical to all of the
defendants in *Mason*.

[12] See also *Chambers v Ohio Dep't of Human Servs*, 145 F3d 793, 801
n 14 (CA 6, 1998), wherein the Sixth Circuit opined, in the context of
Ohio law, that "[a]lthough the *Mendoza* rationale has not been defini-
tively extended to apply to state governments, there is support for that
proposition. The same considerations set forth in *Mendoza* with respect
to the federal government may apply to state governments." (Citations
omitted.) The Sixth Circuit concluded that "[w]hile Ohio law is silent in

litigious private entity does not come close to reaching. Further, government litigation frequently involves legal questions of substantial public importance, such as in this case. We also agree that, because of differences between a state government and private litigants, applying nonmutual collateral estoppel against a state government would thwart the development of important questions of law. It would freeze as final the first decision rendered on a particular legal question, most times prematurely. *Mendoza*, 464 US at 160. That is especially so in this case, as plaintiffs are attempting to offensively apply nonmutual collateral estoppel from an unpublished, limited federal district court case to the matter before us. This application of collateral estoppel would prematurely prevent future courts from exploring these complex and important legal issues as they would be perpetually frozen in time.

Accordingly, defendants are not precluded by *Mason* from arguing that the 1999 amendment to the ELCRA is constitutional.

### V. EQUAL PROTECTION

#### A. BACKGROUND LAW

Because *Mason* is not binding on us or defendants, we next address whether the 1999 amendment to the ELCRA is facially unconstitutional as violative of equal protection.

Under the United States Constitution, no state shall "deny to any person within its jurisdiction the equal protection of the laws." US Const, Am XIV. The Michigan Constitution provides:

---

this respect, given its restrictive views on mutuality, we anticipate that the Ohio Supreme Court would not use offensive non-mutual issue preclusion against the state." *Id*.

> No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. [Const 1963, art 1, § 2.]

The Equal Protection Clause in the Michigan Constitution is coextensive with the Equal Protection Clause in the United States Constitution. *Shepherd Montessori Ctr Milan v Ann Arbor Charter Twp*, 486 Mich 311, 318; 783 NW2d 695 (2010). "[T]he constitutional demand is not a demand that a statute necessarily apply equally to all persons." *Rinaldi v Yeager*, 384 US 305, 309; 86 S Ct 1497; 16 L Ed 2d 577 (1966). "While the Equal Protection Clause ensures that people similarly situated will be treated alike, it does not guarantee that people in different circumstances will be treated the same." *In re Parole of Hill*, 298 Mich App 404, 420; 827 NW2d 407 (2012) (quotation marks, brackets, and citation omitted). The threshold inquiry is whether the plaintiff was treated differently from a similarly situated entity. *Shepherd Montessori*, 486 Mich at 318. Further,

> [t]o determine whether a legislative classification violates equal protection, the reviewing court applies one of three tests. If the legislation creates an inherently suspect classification or affects a fundamental interest, the "strict scrutiny" test applies. Other classifications that are suspect but not inherently suspect are subject to the "substantial relationship" test. However, social and economic legislation is generally examined under the traditional "rational basis" test. [*Zdrojewski v Murphy*, 254 Mich App 50, 79; 657 NW2d 721 (2002) (citations omitted).]

It is well established that "prisoners" are not a suspect class. See *People v Groff*, 204 Mich App 727, 731; 516 NW2d 532 (1994). Plaintiffs' argument that the 1999 amendment "stripped all and only prisoners

of any of ELCRA's remedies for unquestionably uncon-
stitutional discrimination based on age, [disability,]
race, and gender" is not availing. Importantly, the
classification in the 1999 amendment at issue is based
on a person's status as a *prisoner*, not based on any of
the suspect classifications of age, disability, race, or
gender. In other words, the 1999 amendment applies to
*all* prisoners, including males and females, the young
and old, the abled and disabled, and individuals of all
different races. Those suspect classifications simply
are not the dividing lines in this case.

Furthermore, plaintiffs have not sufficiently alleged
that the 1999 ELCRA amendment itself infringes a
protected, fundamental right. Any right implicated
emanates from the statute, which declares that

> [t]he opportunity to obtain employment, housing and
> other real estate, and the full and equal utilization of
> public accommodations, *public service*, and educational
> facilities without discrimination because of religion, race,
> color, national origin, age, sex, height, weight, familial
> status, or marital status . . . is recognized and declared to
> be a civil right. [MCL 37.2102(1) (emphasis added).]

Plaintiffs cite no authority that limits the Legisla-
ture's authority to define what constitutes (or does not
constitute) a "public service" under the ELCRA. There
is nothing in the constitutional mandate regarding
public accommodation or public service. Since the
Legislature created these civil rights,[13] it naturally
follows that it can define the scope of them. See *Beech
Grove Inv Co v Civil Rights Comm*, 380 Mich 405, 426;

---

[13] We note that these legislatively created rights are more expansive
than the rights constitutionally protected under Const 1963, art 1, § 2,
which only covers discrimination on the basis of "religion, race, color or
national origin." In fact, because plaintiffs' claims allege discrimination
on the basis of sex, it is clear that the constitutional rights are not
implicated.

157 NW2d 213 (1968), quoting Cramton, *The Powers of the Michigan Civil Rights Commission*, 63 Mich L Rev 5, 9 (1964) (noting that civil rights were not specifically defined in the Constitution and that the Legislature was to "define their scope, limits, and sanctions").

The fact that this Court has determined that the pre-1999 amendment term "public service" includes prisons does not stand for the proposition that the Legislature could never alter the definition thereafter. See *Doe v Dep't of Corrections*, 240 Mich App 199, 201; 611 NW2d 1 (2000) ("If it is the intent of the Legislature not to have these statutes applied to prisoners and prisons, then it is incumbent on the Legislature to draft and enact statutes that so provide."). Indeed, because of the fact that prisons are not "open to the public," their exclusion as a place of "public service" is reasonable. See *id.* at 206-207 (GRIBBS, J., dissenting) (noting that prisons are not established to provide services *to* the public).

Consequently, because no suspect class—based on age, disability, race, or gender—is being singled out and no fundamental right is being affected, we apply the rational basis test to determine whether the 1999 amendment violates equal protection.[14] "Under the rational basis test, legislation is presumed to be constitutional and will survive review if the classification scheme is rationally related to a legitimate governmental purpose." *Zdrojewski*, 254 Mich App at 80. Further, "the burden of showing a statute to be unconstitutional is on the challenging party, *not* on the party defending the statute." *Shepherd Montessori*, 486 Mich at 319 (quotation marks, brackets, and

[14] Although plaintiffs cite *Romer* and contend that heightened scrutiny should apply, the Court in *Romer* applied rational basis review. *Romer*, 517 US at 632-635.

citation omitted). Thus, "[t]o prevail under this highly deferential standard of review, a challenger must show that the legislation is arbitrary and wholly unrelated in a rational way to the objective of the statute." *Harvey v Michigan*, 469 Mich 1, 7; 664 NW2d 767 (2003) (quotation marks and citation omitted). A classification reviewed under the rational basis test survives if the legislative judgment is supported by any set of facts, either known or that could reasonably be assumed, even if such facts are debatable. *Id*. As our Supreme Court has cautioned, rational basis review does not test the need, wisdom, or appropriateness of the legislation, nor whether the classification is made with mathematical nicety or whether it results in some inequity in practice. *Id*. Rather, the statute is presumed constitutional, and the challenger bears a heavy burden of rebutting this presumption. *Id*.

### B. SIMILARLY SITUATED

Our Supreme Court has advised that, when reviewing an equal-protection challenge to state legislation, the threshold inquiry is whether the plaintiff was treated differently from a similarly situated class of individuals. *Shepherd Montessori*, 486 Mich at 318. Defendants contend that prisoners are not similarly situated to nonprisoners. Plaintiffs make no claim that prisoners are similarly situated to nonprisoners. Instead, they assert that a "similarly situated" analysis is not applicable because that inquiry only applies to "class of one" claims. However, even in cases that do not involve class-of-one claims, we have recognized that equal protection requires only equal treatment for those who are similarly situated. See *Schmude Oil, Inc v Dep't of Environmental Quality*, 306 Mich App 35, 55; 856 NW2d 84 (2014); *Brinkley v*

*Brinkley*, 277 Mich App 23, 35; 742 NW2d 629 (2007); *Crego v Coleman*, 463 Mich 248, 258; 615 NW2d 218 (2000). Moreover, "[t]o be considered similarly situated, the challenger and his comparators must be *prima facie* identical in all relevant respects or directly comparable . . . in all material respects." *Demski v Petlick*, 309 Mich App 404, 464; 873 NW2d 596 (2015) (quotation marks and citation omitted); *Schmude Oil, Inc*, 306 Mich App at 55 (quotation marks and citation omitted).

Prisoners and nonprisoners are not similarly situated in the relevant respects in this case. The most obvious difference is that prisoners lack liberty when receiving what plaintiffs argue are public services. Prisoners are not receiving services from prisons as a result of an invitation or a voluntary arrangement. Very few, if any, voluntarily avail themselves of residency in a correctional facility. Rather, they are compelled to be there, and must be content, for the most part, with the services provided. See *Brown v Genesee Co Bd of Comm'rs (After Remand)*, 464 Mich 430, 439; 628 NW2d 471 (2001) (opinion of CORRIGAN, C.J.) ("[A]n inmate does not visit a jail as a potential invitee. Instead, inmates are *legally compelled* to be there."). Thus, they are not receiving these alleged public services as some type of benefit but instead as a necessary component of the punishment to which a court has sentenced them. Further, while receiving these services, prisoners are not in the same position as the general public, as many of their fundamental rights are severely curtailed. See *Samson v California*, 547 US 843, 848-849; 126 S Ct 2193; 165 L Ed 2d 250 (2006); *Hudson v Palmer*, 468 US 517, 525-526; 104 S Ct 3194; 82 L Ed 2d 393 (1984). See also *People v Maxson*, 181 Mich App 133, 135; 449 NW2d 422 (1989) (stating that "inmates and ordinary citizens are not

similarly situated" in the context of prosecutions for possession of metallic knuckles).[15]

Therefore, especially in light of the fact that plaintiffs fail to offer a cognizable argument that prisoners are similarly situated to nonprisoners, we find there is no genuine issue of material fact regarding prisoners being similarly situated, i.e., identical in all relevant respects or directly comparable in all material respects, to nonprisoners. *Demski*, 309 Mich App at 464.[16]

### C. RATIONAL BASIS

However, even if we were to find that prisoners are similarly situated to nonprisoners, or even if we were not required to engage in such an analysis, plaintiffs' claim would still fail because plaintiffs have failed to show how the 1999 amendment was not rationally related to a legitimate governmental interest.

Defendants offer several purposes behind the 1999 amendment, the first being prison order and management. Generally, it is true that the maintenance of order in a prison is an essential goal that could require limiting or retracting the rights of a prisoner. *Bell v Wolfish*, 441 US 520, 546; 99 S Ct 1861; 60 L Ed 2d 447 (1979). But we fail to see how prohibiting prisoners

---

[15] In various other contexts, courts have found that prisoners and nonprisoners are not similarly situated. See *Smith v Corcoran*, 61 F Appx 919 (CA 5, 2003); *Roller v Gunn*, 107 F3d 227, 234 (CA 4, 1997); *Scher v Chief Postal Inspector*, 973 F2d 682, 683-684 (CA 8, 1992); *Hrbek v Farrier*, 787 F2d 414, 417 (CA 8, 1986); *Niemic v UMass Correctional Health*, 89 F Supp 3d 193 (D Mass, 2015); *Pratt v GEO Group, Inc*, 802 F Supp 2d 1269, 1272 (WD Okla, 2011); *Hertz v Carothers*, 174 P3d 243, 248 (Alas, 2008); *McGuire v Ameritech Servs, Inc*, 253 F Supp 2d 988, 1001 (SD Ohio, 2003); *Rudolph v Cuomo*, 916 F Supp 1308, 1323 (SD NY, 1996).

[16] Because we agree that prisoners are not similarly situated, we decline to address defendants' alternate arguments regarding this issue.

from suing for damages for discrimination under the ELCRA serves the purpose of maintaining prison order. Accordingly, we conclude that this purpose is not rationally related to a legitimate governmental interest.

However, the second purpose defendants offer is the deterrence of meritless lawsuits and the preservation of scarce resources through the reduction of costs associated with resolving those lawsuits. Several courts have already recognized that the preservation of scarce governmental resources from frivolous prisoner actions is a legitimate government interest.

In *Proctor v White Lake Twp Police Dep't*, 248 Mich App 457; 639 NW2d 332 (2001), the plaintiff argued that the provisions of the Freedom of Information Act (FOIA), MCL 15.231 *et seq.*, that excluded incarcerated prisoners from obtaining public records violated equal protection. *Id.* at 468. This Court disagreed. *Id.* at 469-470. We held "that the Legislature's FOIA exclusions singling out incarcerated prisoners rationally relate to the Legislature's legitimate interest in conserving the scarce governmental resources squandered responding to frivolous FOIA requests by incarcerated prisoners." *Id.* at 469.

In *Morales v Parole Bd*, 260 Mich App 29; 676 NW2d 221 (2003), the plaintiff argued that MCL 791.234, which precluded prisoners from appealing the decision of a parole board, violated equal protection. However, we held that the exclusion was "rationally related to the Legislature's legitimate interest in saving public funds in response to innumerable frivolous requests by incarcerated prisoners for the review of the Parole Board's denials of parole. We recognize the government's legitimate interest in conserving the scarce governmental resources[.]" *Id.* at 52.

In cases involving the federal PLRA, the deterrence of meritless lawsuits likewise has been recognized as a legitimate governmental interest. In *Hampton v Hobbs*, 106 F3d 1281, 1283 (CA 6, 1997), the plaintiff argued that the fee requirements of the federal PLRA, which required all prisoners to pay an initial filing fee, violated equal protection. The Sixth Circuit found that "[d]eterring frivolous prisoner filings in the federal courts falls within the realm of Congress's legitimate interests, and the specific provisions in question are rationally related to the achievement of that interest." *Id.* at 1287.

In *Hadix v Johnson*, 230 F3d 840, 842 (CA 6, 2000), the plaintiff argued that the attorney fee cap provision in the federal PLRA violated equal protection. The Sixth Circuit disagreed, finding that the "cap does appear to be rationally related to the very similar goal of decreasing marginal or trivial lawsuits." *Id.* at 845. The court explained that "in lowering the fee recoverable if the claim succeeds, attorneys are likely to demand a more meritorious claim to make the representation worthwhile." *Id.* The Sixth Circuit also found that Congress, by reducing marginal or frivolous lawsuits, "could also rationally be seeking to protect the state and federal treasuries, from which the majority of prisoner civil rights awards are paid." *Id.*

In *Walker v Bain*, 257 F3d 660, 669 (CA 6, 2001), the Sixth Circuit found that the PLRA's cap on the defendants' liability for attorney fees did not violate equal protection. The *Walker* court followed the holding in *Hadix* that the "twin goals of decreasing marginal lawsuits and protecting the public fisc are legitimate government interests, and that decreasing an attorney fee award in the context of prisoner civil rights litigation serves both of these interests." *Walker*, 257 F3d at 669.

As the foregoing cases illustrate, it is well established that deterring frivolous prisoner lawsuits furthers a legitimate governmental interest. Not only can the Legislature impose limits on how prisoners interact with the courts, it can wholly preclude them from filing certain claims. See *Proctor*, 248 Mich App at 469-470. Even if defendants did not provide any evidence that prisoners have a history of excess filings of frivolous discrimination claims, this fact does not make the 1999 amendment invalid. That is because legislation subject to rational basis review "passes constitutional muster if the legislative judgment is supported by any set of facts, either known or which could reasonably be assumed, even if such facts may be debatable." *Harvey*, 469 Mich at 7 (quotation marks and citation omitted). Thus, the Legislature could reasonably assume that prisoners frequently file frivolous lawsuits in general. Scarce resources are preserved when fewer lawsuits are filed against correctional facilities and prison officials. And even though prisoners with meritorious claims of discrimination are precluded by virtue of the 1999 amendment, under the rational basis test, courts do not inquire into whether the legislation results in some inequity. *Id.* Nor do we test the need, wisdom, or appropriateness of the legislation. *Id.* Rather, we remain vigilant in our limited role, which is to presume that the statute is constitutional and to hold the challenger to its heavy burden of rebutting this presumption. *Id.*

Because the 1999 amendment is rationally related to the legitimate interests of deterring frivolous lawsuits and preserving scarce public resources, we hold that the amendment passes the rational basis test and is constitutional. Accordingly, defendants were entitled to summary disposition because, with the state correctional facilities in this case not being areas of "public

service" under the ELCRA, plaintiffs have failed to state a claim on which relief could be granted. MCR 2.116(C)(8). Therefore, the trial court erred by denying defendants' motion for summary disposition on this ground. Because our analysis disposes of the lawsuit, we decline to address defendants' alternate arguments regarding plaintiffs' failure to state a claim.[17]

In essence, plaintiffs' suit here is about whether prisoners can seek a remedy under the ELCRA. We do not pass judgment on the validity of the underlying claims of this lawsuit. Although the ELCRA may not be among the avenues through which plaintiffs can seek monetary redress for their alleged injuries, as discussed, this fact alone does not render the statute unconstitutional, nor does it preclude plaintiffs from pursuing remedies available to them through other legal avenues.

Plaintiffs' claim that each of them was sexually assaulted while in a correctional facility would, if proven, amount to extremely egregious and reprehensible conduct by defendants. But this case concerns only plaintiffs' ability to sue for damages under the ELCRA, as opposed to addressing their grievances through other civil or constitutional remedies that may exist.[18] In fact, plaintiffs already have initiated a

---

[17] Because we agree that prisoners are not similarly situated, we decline to address defendants' alternate arguments regarding this issue.

[18] Although plaintiff's allegations relate to the fundamental right to be free from sexual assault, at its essence, the matter before us is about the right of prisoners to sue for money damages under the ELCRA. Furthermore, the right to be free from sexual assault rests in substantive due process, and plaintiffs have asserted only an equal protection challenge to the 1999 amendment. *Doe v Claiborne Co*, 103 F3d 495, 506 (CA 6, 1996). See also *Albright v Oliver*, 510 US 266, 272; 114 S Ct 807; 127 L Ed 2d 114 (1994); *Ingraham v Wright*, 430 US 651, 673; 97

companion case in a federal court action under 42
USC 1983. In addition, plaintiffs could again choose
to seek relief under the PLRA. Additionally, they
could seek injunctive relief through a constitutional
action, or initiate individual tort claims. *Sharp v
Lansing*, 464 Mich 792, 801; 629 NW2d 873 (2001).
Thus, while prisoner lawsuits relating to correctional
facilities as places of public service are precluded
under the ELCRA, plaintiffs' inability to sue under
this statute does not preclude them from seeking
redress for the serious wrongs they are alleging
through any other avenues that may be available to
them.[19] Nor are plaintiffs, or others, precluded from
seeking a legislative change to the ELCRA to allow
prisoner public service lawsuits under the statute.[20]

## VI. CONCLUSION

In Docket No. 321013, we agree with defendants
that the trial court erred by failing to grant them
summary disposition regarding plaintiffs' failure to
comply with the disclosure requirements of MCL
600.5507. In Docket No. 321756, we likewise agree

---

S Ct 1401; 51 L Ed 2d 711 (1977); *Union Pacific R Co v Botsford*, 141
US 250, 251; 11 S Ct 1000; 35 L Ed 734 (1891).

[19] In their briefing, plaintiffs refer to their fundamental right to
access the courts. However, in light of the many actions plaintiffs
remain free to pursue, their right of access to the courts is not
foreclosed by our decision in this matter. See *Mich Deferred Present-
ment Servs Ass'n v Comm'r of Office of Fin & Ins Regulation*, 287 Mich
App 326, 336; 788 NW2d 842 (2010); *Stevenson v Reese*, 239 Mich App
513, 518-519; 609 NW2d 195 (2000); *American States Ins Co v Dep't of
Treasury*, 220 Mich App 586, 595-596; 560 NW2d 644 (1996).

[20] While the dissent claims that plaintiffs would be hard-pressed to
find attorneys to represent them if they were not permitted to sue under
the ELCRA, that conclusion is purely speculative and not based on
anything in the record before us.

with defendants that the trial court erred in failing to grant them summary disposition regarding plaintiffs' claims under the ELCRA. We have reviewed all remaining issues and find them to be without merit or unnecessary for the disposition of this appeal. We reverse and remand for entry of summary disposition in favor of defendants. We do not retain jurisdiction.

DONOFRIO, J., concurred with RIORDAN, P.J.

BECKERING, J. (*concurring in part and dissenting in part*). This case is about the alleged rape, sexual harassment, and physical assault of minors who are confined in adult prisons operated by the Michigan Department of Corrections. At issue in this appeal is the Legislature's attempt to shield the state from liability for its conduct in allegedly condoning, perpetuating, and even participating in these grievances—and any other civil rights violations for that matter—upon our state's incarcerated individuals. Because I conclude that the Legislature's amendment of the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq.*, specifically MCL 37.2301(b), by excluding prisoners from the scope of the act, is unconstitutional, I would affirm the trial court's denial of defendants' motion for summary disposition on this issue. Because I find that plaintiffs have stated a claim, I would also affirm the trial court's denial of defendants' motion for summary disposition under MCR 2.116(C)(8). Finally, because I am bound by precedent, I must concur with the majority's ruling with respect to plaintiffs' failure to comply with the disclosure requirements of the prison litigation reform act (PLRA), specifically MCL 600.5507(2), although dismissal would be without prejudice. Were I not bound by precedent, I would allow plaintiffs to file

an amended complaint in compliance with MCL
600.5507(2).

## I. PRISON LITIGATION REFORM ACT

Defendants contend that plaintiffs failed to meet the
disclosure requirements set forth in the PLRA, specifi-
cally MCL 600.5507(2), which provides that "[a] pris-
oner who brings a civil action or appeals a judgment
concerning prison conditions shall, upon commence-
ment of the action or initiation of the appeal, disclose
the number of civil actions and appeals that the
prisoner has previously initiated." The majority agrees
with defendants, and so do I. And I am bound by
precedent to agree that dismissal is the proper remedy.

When filing suit in this case, plaintiffs identified the
following on the face of their complaint:

> A civil action between these parties or other parties
> arising out of the transaction or occurrence alleged in the
> complaint has been previously filed in this court, where it
> was given docket number 13-1049-CZ and was assigned to
> Judge Kuhnke. The action is no longer pending.
>
> In addition, a civil action between these parties or other
> parties arising out of the transaction or occurrence alleged
> in the complaint has previously been filed in the Eastern
> District of Michigan and was assigned to Judge Cleland.
> The action remains pending.

I agree with the majority's opinion that the above
disclosure has all the earmarks of a disclosure in
accordance with MCR 2.113(C)(2), rather than an
effort to comply with MCL 600.5507(2). Despite plain-
tiffs' assertions that the disclosure satisfies the PLRA
requirements, like the majority, I must disagree. The
disclosure failed to identify the parties of the previous
litigation and left no clues as to how many other
lawsuits plaintiffs previously initiated. The statute

unambiguously mandates the disclosure of the number of civil actions previously initiated, "even when that number is zero." *Tomzek v Dep't of Corrections*, 258 Mich App 222, 225; 672 NW2d 511 (2003).

Although plaintiffs argue that the disclosure requirements of MCL 600.5507(2) apply only to civil actions filed by prisoners seeking indigency status, I agree with the majority that subsection (2) is not so limited. It broadly imposes the disclosure requirements on "[a] prisoner who brings a civil action" and does not qualify this language as applying only to a certain class of prisoner litigants. See *Barrow v Detroit Election Comm*, 301 Mich App 404, 414; 836 NW2d 498 (2013) (the Legislature's use of the indefinite article "a" refers to a general item, not a particular item). And for reasons that are adequately explained by the majority, there is no merit to plaintiffs' argument that either the context of the statute or the act's legislative history requires a different result.

I write separately to voice my concerns about the proper interpretation of MCL 600.5507(3) concerning whether and when dismissal of a lawsuit is required. MCL 600.5507(3) provides in pertinent part:

> The court shall dismiss a civil action or appeal at any time, regardless of any filing fee that may have been paid, if the court finds any of the following:

> * * *

> (b) The prisoner *fails to comply* with the disclosure requirements of subsection (2). [Emphasis added.]

As the majority notes, employment of the phrase "shall dismiss" deems an action mandatory, and this Court in *Tomzek*, 258 Mich App at 223, held that this phrase "mandates dismissal" "without regard to how or when

the issue was raised." In light of *Tomzek*, I must concur
in the result reached by the majority, although I would
note that the dismissal is without prejudice.[1] My
concern, however, is that this interpretation ignores
the present-tense aspect of Subsection (3)(b), wherein
it states that dismissal is required if the prisoner "fails
to comply" with the disclosure requirements of Subsec-
tion (2). That phrase could be interpreted one of two
ways in the context of the statute. One could conclude,
as does *Tomzek* and the majority, that Subsection (3)
requires a civil action to be dismissed if the plaintiff
failed to provide the necessary disclosure information
in keeping with the temporal requirement of Subsec-
tion (2), being "upon commencement of the action or
initiation of the appeal."[2] However, one could also
conclude that Subsection (3) only requires dismissal if
the plaintiff "fails to" comply with the disclosure re-
quirement, meaning that he or she *has not* provided
the disclosure information, and thus, he or she is
subject to dismissal as a consequence of such failure.[3]
The former interpretation is quite literal, and begets a
"Simon Says" procedural requirement. The latter is
more logical and comports with the present-tense verb
provided in Subsection (3), as there is no discernible
reason why a case should be dismissed if the plaintiff
did in fact make the disclosure, albeit not on the face of

---

[1] Given the majority's corresponding substantive rulings, the nature
of dismissal with respect to the PRLA issue is rendered immaterial.

[2] MCR 2.101(B) describes "Commencement of Action" as follows: "A
civil action is commenced by filing a complaint with a court."

[3] The present tense of a verb is used to "express *present time*" and to
"make a statement that is *true at all times*." Sabin, *The Gregg Reference
Manual* (11th ed) (New York: McGraw-Hill, 2011), p 313. A court is to
interpret and enforce statutes as written, and "[t]his includes, without
reservation, the Legislature's choice of tense." *Holland v Consumers
Energy Co*, 308 Mich App 675, 684; 866 NW2d 871 (2015).

the initial complaint.[4] What is the point of dismissal if the plaintiff has complied and defendant has the necessary information required by Subsection (2)? It would be a purely punitive measure, as dismissing a lawsuit even after the plaintiff has filed the necessary disclosure information would serve no other purpose, especially since Subsection (2) applies to nonindigent as well as indigent prisoners.

Interpreting MCL 600.5507(3) as the majority and *Tomzek* do also creates fertile ground for gamesmanship. For instance, if a plaintiff fails to comply with the statute, nothing would prevent a defendant from waiting a year or two after the lawsuit is filed to raise the issue and gain dismissal of the suit. In fact, a defendant could litigate the matter on the merits, and upon receiving an unfavorable verdict, simply invoke the plaintiff's failure to timely comply with MCL 600.5507(2) as a postjudgment parachute. Given the present interpretation, dismissal would be required years into the litigation, even if the plaintiff had filed his or her disclosure shortly after filing the complaint. Put simply, MCL 600.5507, as previously interpreted by this Court, creates an escape hatch or "get out of jail free" card to be used at the leisure of the defendant. Had this Court not already interpreted the meaning of Subsection (3), I would permit plaintiffs to file an amended complaint with the requisite disclosures under MCL 600.5507(2) such that dismissal would not be required.[5] MCR 7.215(C)(2).

---

[4] One could also interpret more generally the phrase "upon commencement of the action," as used in MCL 600.5507(2), as meaning at the outset of the case, rather than necessarily being tied to the actual filing of the complaint.

[5] I note that plaintiffs were without the option of voluntarily dismissing the complaint in order to refile and comply with the disclosure requirements because they had already voluntarily dismissed once, and

II. ELCRA AND CONST 1963, ART 1, § 2

"[W]hen you take away the freedom of equality or justice of any individual, you all suffer." Statement of Delegate Malcolm Gray Dade, 1 Official Record, Constitutional Convention 1961, p 743. Somewhat befitting the present controversy, this statement was made in relation to the adoption of Const 1963, art 1, § 2, the provision at issue in this case. Yet, despite a clear constitutional mandate that the enabling legislation to be implemented in compliance with Const 1963, art 1, § 2, apply to *all* citizens, without limitation, in 1999 the Legislature attempted to take away the rights of prisoners who seek redress under the ELCRA. It is this exclusion from protection under the ELCRA that, in my opinion, renders the 1999 amendment to the ELCRA unconstitutional.

A. STANDARD OF REVIEW

At issue in this case is the constitutionality of a 1999 amendment to the ELCRA, a question that we review de novo. See *Dep't of Transp v Tomkins*, 481 Mich 184, 190; 749 NW2d 716 (2008).[6] In my view, the constitutionality of the 1999 amendment turns on an examination of Const 1963, art 1, § 2 and the directive to the Legislature contained therein. "When interpreting the

a second voluntary dismissal would have operated as an adjudication on the merits. MCR 2.504(A)(1). I also note that the trial court, before ruling on defendants' motion for summary disposition based on the disclosure requirements, stated that it would give plaintiffs leave to amend if they wished. It does not appear that plaintiffs took the opportunity to amend at that time.

[6] In reviewing the constitutionality of the statute, this Court is to presume that the statute is constitutional, and we are "to construe a statute as constitutional unless its unconstitutionality is clearly apparent." *Taylor v Gate Pharm*, 468 Mich 1, 6; 658 NW2d 127 (2003).

Constitution, our task is to give effect to the common understanding of the text[.]" *Lapeer Co Clerk v Lapeer Circuit Court*, 469 Mich 146, 155; 665 NW2d 452 (2003).

### B. DEVELOPMENT OF CIVIL RIGHTS LEGISLATION

#### 1. THE MICHIGAN CONSTITUTION GUARANTEES PROTECTION TO ALL CITIZENS

Michigan's Equal Protection Clause, set forth in Const 1963, art 1, § 2, provides:

> *No person* shall be denied the equal protection of the laws; nor shall *any person* be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature *shall implement* this section by appropriate legislation. [Emphasis added.]

The second clause in the first sentence of Const 1963, art 1, § 2 guarantees certain civil rights to all, as it provides, "nor shall *any person* be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color, or national origin." This guarantee is made to "any person," without exclusion or qualification. The official record of the constitutional convention demonstrates that it was unquestionably the intent of the ratifiers that civil rights protections be extended to *any* and *all* persons.[7] Indeed, the record emphasized that article 1, § 2 was in line with the "distinct trend in recent state constitutions" that "civil rights clauses . . . apply to *all persons* . . . ." 1 Official Record, Constitutional Convention 1961, p 740 (emphasis added). A

---

[7] "Records of the constitutional convention may be consulted to ascertain the intent of the provision" at issue. *Kuhn v Secretary of State*, 228 Mich App 319, 324; 579 NW2d 101 (1998).

committee report from the constitutional convention approvingly quoted testimony stating that the goals of the ratifiers " 'must include the intent that *each of our citizens, all of our citizens*, shall enjoy equal protection of the law *in all areas of living* which involve fundamental human rights, fundamental civil rights in this our beloved state of Michigan.' " *Id.* at 741. The committee report went on to say that "[s]uch intent, the intent that *each of Michigan's citizens* have 'equal access' to the 'fundamental rights in our complex society' . . . should in our opinion be stated simply and clearly . . . ." *Id.* (emphasis added).[8]

While the second clause of the first sentence mandates to whom protections are to apply, the second sentence of art 1, § 2 imposes a mandate on the Legislature: "[t]he legislature *shall implement* this section by appropriate legislation." The directive given to the Legislature is a mandatory one. See *Co Rd Ass'n of Mich v Governor*, 260 Mich App 299, 306; 677 NW2d 340 (2004), aff'd in part 474 Mich 11 (2005) (when interpreting a provision of the Michigan Constitution, "[i]t is well-established that the use of the word 'shall' rather than 'may' indicates a mandatory, rather than discretionary, action"). Thus, when read in combination, Const 1963, art 1, § 2 provides that the Legislature *must* enact legislation protecting the rights of *any or all* persons, without limitation. In short, article 1, § 2 required the enactment of legislation designed to pro-

---

[8] Although various drafts of article 1, § 2 were proposed throughout the process of drafting the Constitution, the notion that "each person" was entitled to civil rights protection or that "no person" shall be denied civil rights was maintained throughout the constitutional convention. 1 Official Record, Constitutional Convention 1961, p 739-742, 749; 2 Official Record, Constitutional Convention 1961, p 2887-2889.

tect the civil rights of *all*, and the mandatory nature of its language makes apparent that the Legislature was without authority to exclude anyone from protection under the resulting legislation.

### 2. THE LEGISLATURE COMPLIES WITH MANDATORY ENABLING ACT REQUIREMENTS

In response to the mandate imposed by our Constitution, the Legislature enacted the Civil Rights Act, now known as the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq*. The act was intended to "centralize and make uniform the patchwork of then-existing civil rights statutes" in the private sector and to "broaden the scope of the then-existing civil rights statutes to include governmental action[.]" *Neal v Dep't of Corrections (On Rehearing)*, 232 Mich App 730, 738-739; 592 NW2d 370 (1998) (*Neal II*). See also *Dep't of Civil Rights ex rel Forton v Waterford Twp Dep't of Parks & Recreation*, 425 Mich 173, 186; 387 NW2d 821 (1986). The ELCRA provides that a person shall not

> [d]eny *an individual* the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or *public service* because of religion, race, color, national origin, age, sex, or marital status. [MCL 37.2302(a) (emphasis added).]

MCL 37.2301(b), as enacted in 1976, defined "public service" as

> a public facility, department, agency, board, or commission, owned, operated, or managed by or on behalf of the state, a political subdivision, or an agency thereof or a tax exempt private agency established to provide service to the public . . . .

This definition of public service remained unchanged for more than 20 years.

In the mid-1990s, a group of women housed in facilities operated by the MDOC filed a class action against the MDOC alleging that male corrections personnel were systematically engaging in a pattern of sexual harassment of female inmates. *Neal v Dep't of Corrections*, 230 Mich App 202; 583 NW2d 249 (1998) (*Neal I*). Specifically, plaintiffs complained that

> the MDOC assigns male officers to the housing units at all women's facilities without providing any training related to cross-gender supervision; that women are forced to dress, undress, and perform basic hygiene and body functions in the open with male officers observing; that defendants allow male officers to observe during gynecological and other intimate medical care; that defendants require male officers to perform body searches of women prisoners that include pat-downs of their breasts and genital areas; that women prisoners are routinely subjected to offensive sex-based sexual harassment, offensive touching, and requests for sexual acts by male officers; and that there is a pattern of male officers' requesting sexual acts from women prisoners as a condition of retaining good-time credits, work details, and educational and rehabilitative program opportunities. [*Id*. at 205.]

In *Neal I*, this Court initially held that prisons were not a place of "public service" as the term is used in the ELCRA. *Id*. at 215. However, on rehearing, this Court held that prisons are places of "public service" and that the ELCRA was intended to protect prisoners, among others. *Neal II*, 232 Mich App at 736-738.

### 3. IN RESPONSE TO *NEAL II*, THE LEGISLATURE ATTEMPTS TO CARVE OUT PRISONERS FROM ALL CIVIL RIGHTS PROTECTIONS UNDER THE ENABLING ACT

In response to *Neal II*, in 1999 the Legislature attempted to carve out from protection under the ELCRA one subset of individuals—persons in our state who are incarcerated. To do so, the Legislature

amended the definition of "public service" as the term is used in the ELCRA. The term "public service" is now defined in the statute to mean

> a public facility, department, agency, board, or commission, owned, operated, or managed by or on behalf of the state, a political subdivision, or an agency thereof or a tax exempt private agency established to provide service to the public, *except that public service does not include a state or county correctional facility with respect to actions and decisions regarding an individual serving a sentence of imprisonment*. [MCL 37.2301(b) (emphasis added).]

As if there were any doubt that the 1999 amendment was intended to specifically exclude prisoners, enacting § 1 of 1999 PA 202 stated that the amendment to the ELCRA was

> curative and intended to correct any misinterpretation of legislative intent in the court of appeals decision Neal v Department of Corrections, 232 Mich App 730 (1998). This legislation further expresses the original intent of the legislature that an individual serving a sentence of imprisonment in a state or county correctional facility is not within the purview of this act.

In light of that clear intention to exclude prisoners from the scope of the ELCRA's protections, it is undisputed that the 1999 amendment would prohibit the instant litigation. The remaining inquiry, in my mind, should focus on whether the Legislature had authority to enact such an exclusion in the first instance.

C. THE 1999 AMENDMENT VIOLATES A CONSTITUTIONAL MANDATE

The parties and the majority frame the issue at hand as one calling for a determination of whether the 1999 amendment to the ELCRA violates equal protection by denying prisoners, as a class, protections under the ELCRA. In my opinion, this focus is directed at the wrong section of Const 1963, art 1, § 2. I believe that

the analysis misses a more significant and dispositive issue. That is, whether the Legislature has authority, given the constitutional directive in Const 1963, art 1, § 2 pertaining to *all citizens*, to carve out a particular class of individuals and exclude them from the protections of the ELCRA.

I would hold that the Legislature acted outside of its constitutional authority by removing prisoners from the scope of the ELCRA and thereby denying protection to all. Where the analysis in this case should start, and end, in my opinion, is with the idea that Const 1963, art 1, § 2 contains more than just the guarantee of equal protection of the laws; it contains a directive to the Legislature to implement legislation that protects the rights of *all* citizens. Again, that clause provides:

> *No person* shall be denied the equal protection of the laws; nor shall *any person* be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation. [Const 1963, art 1, § 2 (emphasis added).]

As noted, the necessary corollary of the phrase "nor shall any person be denied the enjoyment of his civil rights" is that *all* persons, without exclusion, are entitled to have certain civil rights protected by "appropriate legislation." The problem with the 1999 amendment to the ELCRA is that, by excluding a certain class of individuals—prisoners—from the protections of the ELCRA, the Legislature has acted in a way that is contrary to Const 1963, art 1, § 2.[9]

---

[9] From the outset, the 1999 amendment was a legislative attempt to exclude prisoners from ELCRA protection, following the state's being held accountable for the assault of female prisoners in *Neal II*. Indeed, as noted, 1999 PA 202 was never shy about the notion that it expressly intended to exclude prisoners from the scope of protection under the

Thus, rather than honoring the constitutional mandate to implement civil rights legislation as to "all," the 1999 amendment expressly excludes prisoners from any protection under the ELCRA. The mandates and directives of Const 1963, art 1, § 2 could not have been clearer. Const 1963, art 1, § 2 did not state that the Legislature "shall implement" the civil rights guarantees provided to those whom it deems worthy of receiving such protection. Rather, the Constitution clearly and explicitly provides that "[n]o person" shall be denied equal protection, "nor shall any person be denied" the enjoyment of his civil rights. Such language leaves no room for reservation or qualification. The Legislature cannot ignore that plain, unambiguous constitutional mandate. Indeed, "[a] fundamental and indisputable tenet of law is that a constitutional mandate cannot be restricted or limited by the whims of a legislative body through the enactment of a statute." *AFSCME Council 25 v Wayne Co*, 292 Mich App 68, 93; 811 NW2d 4 (2011). Given that the resulting civil rights legislation was to apply to "any person" without limitation, the Legislature could no sooner enact an amendment to the ELCRA excluding prisoners from the scope of the statute than it could decide to exclude from the act blue-eyed individuals, African-Americans, or anyone named "Steve." See *id*. See also *Durant v State Bd of Ed*, 424 Mich 364, 392; 381 NW2d 662 (1985) ("The state may not avoid the clear requirements [of a constitutional mandate] either by specific statute or by implementation of definitions adverse to the mandate of the people."). To the extent a statute infringes a constitutional directive, the statute must

ELCRA. The act stated that "[t]his legislation further expresses the original intent of the legislature that an individual serving a sentence of imprisonment in a state or county correctional facility *is not within the purview of this act*."

"succumb to the primacy of the Michigan Constitution." *AFSCME Council 25*, 292 Mich App at 95. Because the 1999 amendment excluding prisoners from protection under the ELCRA is incongruous with the directives contained in Const 1963, art 1, § 2, it violates the Michigan Constitution and cannot stand.[10] Where the ratifiers saw fit to extend the protections under Const 1963, art 1, § 2, to "any person," the Legislature was without authority to enact legislation denying those protections to a particular group of individuals. See *AFSCME Council 25*, 292 Mich App at 93, 95.

To this end, the instant situation is analogous to our Supreme Court's decision in *Midland Cogeneration Venture Ltd Partnership v Naftaly*, 489 Mich 83; 803 NW2d 674 (2011). That case concerned whether MCL 211.34c(6) could prevent aggrieved parties from appealing a decision of the state tax commission regarding classification decisions. *Id.* at 87-88. The constitutional provision at issue, Const 1963, art 6, § 28, guaranteed judicial review of administrative decisions—assuming the administrative decision met certain requirements—and provided that those decisions "shall be subject to direct review by the courts *as provided by law*." (Emphasis added.) The defendants in that case argued that the "as provided by law" language meant that the Legislature could implement limited judicial review. *Midland Cogeneration*, 489

---

[10] In this regard, it matters not whether prisoners, although they are excluded from the protections of the ELCRA, can obtain injunctive or declaratory relief for certain civil rights violations under Const 1963, art 1, § 2. Instead, what matters is what the Constitution *requires*—that the Legislature enact statutes protecting the civil rights of all—and what the Legislature *did*—it enacted statutes protecting the civil rights of all, *except for prisoners*. The decision to exclude prisoners violated the "any person" mandate and is unconstitutional.

Mich at 93. This Court agreed. See *Iron Mt Info Mgt, Inc v State Tax Comm*, 286 Mich App 616, 621; 780 NW2d 923 (2009). However, our Supreme Court reversed, holding that while "as provided by law" meant that the Legislature could enact legislation as to the *manner* in which judicial review occurred, it could not preclude judicial review entirely, as judicial review was mandated by the Constitution. *Midland Cogeneration*, 489 Mich at 94. The Court held that "[t]he Legislature may not eradicate a constitutional guarantee in reliance on the language" in the same constitutional amendment granting certain implementation authority to the Legislature. *Id.* Further, the Court explained that the implementing language at issue in that case did "not grant the Legislature the authority to circumvent the protections that the section guarantees. If it did, those protections would lose their strength because the Legislature could render the entire provision mere surplusage." *Id.* at 95.

Turning back to the instant case, the Legislature is not permitted, pursuant to the implementation language contained in Const 1963, art 1, § 2, to define the persons to whom civil rights are guaranteed. The Constitution already answers that question, unequivocally guaranteeing that legislation to protect civil rights must be extended to all, without reservation or limitation. Any implementation language contained in Const 1963, art 1, § 2 should not be construed as giving the Legislature "the authority to circumvent the protections that the section guarantees." See *Midland Cogeneration*, 489 Mich at 95. If it did, just as the Court cautioned in *Midland Cogeneration*, the protection of "any person" would "lose [its] strength" and the Legislature would render such protection meaningless. See *id.* Consequently, I would hold that the 1999

amendment, by eradicating a constitutional guarantee, violates Const 1963, art 1, § 2.

Moreover, our Supreme Court in *Sharp v Lansing*, 464 Mich 792; 629 NW2d 873 (2001), has recognized that the implementation mandate found in Const 1963, art 1, § 2 does not confer discretion on the Legislature to change the mandated protections found in article 1, § 2. Despite the fact that it was given authority to *implement* the constitutional protections at issue, the Legislature was not given authority to *define* those protections in a manner that was inconsistent with the Constitution.

> While the second sentence of art 1, § 2 commits its affirmative "implementation" to the Legislature, the first sentence of this constitutional provision commands that "[n]o person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color, or national origin." The duty imposed on the Legislature by the second sentence of art 1, § 2 to *implement* art 1, § 2 is not a power to ultimately *define* the substantive meaning of the first sentence. [*Sharp*, 464 Mich at 801-802.]

Here, the Legislature went beyond its authority to implement article 1, § 2 by "appropriate legislation" and attempted to define the meaning of the constitutional mandate by narrowing the scope of protected individuals. Where the Constitution mandated that the Legislature was to provide "by appropriate legislation" certain protections to everyone, without reservation or limitation, the Legislature was not justified in excluding some from that protection.

As further illustration of the constitutional violation occasioned by the 1999 amendment, I compare the instant constitutional provision to Const 1963, art 4,

§ 52, which provides for the preservation of natural resources and requires the Legislature to take action to do so:

> The conservation and development of the natural resources of the state are hereby declared to be of paramount public concern in the interest of the health, safety and general welfare of the people. *The legislature shall provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction.* [Emphasis added.]

"[I]t is clear that [the second sentence of art 4, § 52] must be read as a mandatory command to the Legislature." *State Hwy Comm v Vanderkloot*, 392 Mich 159, 180; 220 NW2d 416 (1974) (opinion by WILLIAMS, J.). See also *Genesco, Inc v Mich Dep't of Environmental Quality*, 250 Mich App 45, 54; 645 NW2d 319 (2002) (recognizing that the duty imposed on the Legislature to protect the state's natural resources is mandatory).[11] Consider the following hypothetical situations. Consistent with the mandate in Const 1963, art 4, § 52, could the Legislature decide that the protection of water and other natural resources was desirable, but deem the protection of air too inconvenient, and enact legislation stating that there were to be no regulations as to air quality or air pollution? Or, for that matter, could the Legislature decide to protect air, water, and natural resources from destruction, but enact legislation stating that there was to be no regulation, whatsoever, with regard to the pollution of those same resources? Surely no one would argue that these hypothetical legislative enactments would be constitutional, as they clearly violate the constitutional mandate set forth in

---

[11] To comply with this constitutional provision, the Legislature enacted what is now known as the Natural Resources and Environmental Protection Act, MCL 324.101 *et seq*. See *Genesco*, 250 Mich App at 54.

Const 1963, art 4, § 52. Yet, that is precisely what has occurred in this case. In enacting the 1999 amendment to the ELCRA, the Legislature has declined to honor the entire constitutional mandate found in Const 1963, art 1, § 2.

As a result, I would hold that the 1999 amendment to the ELCRA is unconstitutional. I would affirm the trial court's ruling, albeit for the reasons stated above rather than finding that the statute violates equal protection guarantees. See *Messenger v Ingham Co Prosecutor*, 232 Mich App 633, 643; 591 NW2d 393 (1998) ("When this Court concludes that a trial court has reached the correct result, this Court will affirm even if it does so under alternative reasoning."). Given this conclusion, there is no need to evaluate the exclusion of prisoners from the scope of the ELCRA on equal protection grounds.[12] The analysis of the constitutionality of the 1999 amendment should begin with the directive given to the Legislature in Const 1963, art 1, § 2 and end with the conclusion that the 1999 amendment is constitutionally infirm because it is contrary to the directive contained in article 1, § 2. See *Midland Cogeneration*, 489 Mich at 94; *AFSCME Council 25*, 292 Mich App at 93.

### III. EQUAL PROTECTION

While I find it unnecessary to perform an equal protection analysis, I would agree with the trial court that the 1999 amendment, even assuming it did not violate the constitutional authority conferred upon the Legislature, amounted to an equal protection violation.

---

[12] Nevertheless, as discussed later in this opinion, I would conclude that the amendment cannot withstand an equal protection challenge.

"Equal protection is guaranteed under the federal and state constitutions[.]" *Morales v Parole Bd*, 260 Mich App 29, 49; 676 NW2d 221 (2003), citing US Const, Am XIV and Const 1963, art 1, § 2. The Equal Protection Clause requires that all persons similarly situated be treated alike under the law; it does not guarantee that people in different circumstances will be treated the same. *Shepherd Montessori Ctr Milan v Ann Arbor Charter Twp*, 486 Mich 311, 318; 783 NW2d 695 (2010); *In re Parole of Hill*, 298 Mich App 404, 420; 827 NW2d 407 (2012). "Courts apply one of three tests when reviewing a party's challenge of a legislative classification as violative of equal protection. Which test applies depends on the type of classification made by the statute and the nature of the interest affected." *Proctor v White Lake Twp Police Dep't*, 248 Mich App 457, 469; 639 NW2d 332 (2001). Because the legislation at issue neither infringes a fundamental right nor involves a suspect class or quasi-suspect class, rational-basis review applies. *Shepherd Montessori*, 486 Mich at 318-319.

### A. SIMILARLY SITUATED

As a threshold matter, I would find that plaintiffs, who are prisoners, are similarly situated to nonprisoners in regard to the legislation at issue concerning the protection of a person's civil rights. "In typical equal protection cases, plaintiffs generally allege that they have been arbitrarily classified as members of an identifiable group." *Davis v Prison Health Servs*, 679 F3d 433, 441 (CA 6, 2012) (citation and quotation marks omitted). See also *Engquist v Oregon Dep't of Agriculture*, 553 US 591, 601; 128 S Ct 2146; 170 L Ed 2d 975 (2008). Plaintiffs, as an identifiable group, i.e.,

prisoners,[13] are being treated differently than nonprisoners. The question then becomes: are prisoners and nonprisoners similarly situated? This inquiry does not focus on whether the two groups are similarly situated in general, nor is it relevant whether courts have found that prisoners and nonprisoners are not similarly situated in different, unrelated contexts.[14] Rather,

---

[13] This Court has, in rejecting the assertion that state prisoners are a suspect class, treated prisoners as an identifiable group for purposes of equal protection claims. See *People v Groff*, 204 Mich App 727, 731; 516 NW2d 532 (1994).

[14] In concluding that plaintiffs, as prisoners, are not similarly situated to nonprisoners, the majority opinion cites several cases in support of its conclusion. However, the analysis in those cases involved issues that were quite different from the issue in the case at bar, and I find those cases do not resolve the "similarly situated" issue here. For instance, the majority cites *Samson v California*, 547 US 843, 848; 126 S Ct 2193; 165 L Ed 2d 250 (2006), and *Hudson v Palmer*, 468 US 517, 525-526; 104 S Ct 3194; 82 L Ed 2d 393 (1984); however, those cases simply stated that prisoners—or probationers in the case of *Samson*—do not enjoy the same liberties as the average citizen does. The other cases cited by the majority pertained to issues that are unrelated to the challenged governmental action in this case. See *Niemic v UMass Correctional Health*, 89 F Supp 3d 193 (D Mass, 2015) (finding that prisoners were not similarly situated to nonprisoners for purposes of administering certain medical treatment); *Pratt v GEO Group, Inc*, 802 F Supp 2d 1269, 1272 (WD Okla, 2011) (declaring that prisoners were not similarly situated to nonprisoners for purposes of applying the statute of limitations to certain claims); *Hertz v Carothers*, 174 P3d 243, 248 (Alas, 2008) (prisoners were not similarly situated to nonprisoners for purposes of certain filing fees); *McGuire v Ameritech Servs, Inc*, 253 F Supp 2d 988, 1001 (SD Ohio, 2003) (prisoners and nonprisoners were not similarly situated for purposes of claims relating to collect telephone calls between prisoners and nonprisoners); *Smith v Corcoran*, 61 Fed Appx 919 (CA 5, 2003) (prisoners not similarly situated to nonprisoners for purposes of a claim that the postal inspector unjustly refused to investigate the plaintiff's claim of mail tampering); *Roller v Gunn*, 107 F3d 227, 234 (CA 4, 1997) (prisoners and nonprisoners not similarly situated with regard to the payment of certain filing fees); *Rudolph v Cuomo*, 916 F Supp 1308, 1323 (SD NY, 1996) (prisoners were not similarly situated to nonprisoners for purposes of obtaining an indigency waiver for Motor Vehicle and Parks laws on surcharges);

"[t]he similarly situated inquiry focuses on whether the plaintiffs are similarly situated to another group *for purposes of the challenged government action.*" *Klinger v Dep't of Corrections,* 31 F3d 727, 731 (CA 8, 1994) (emphasis added). Hence, the issue is whether plaintiffs are similarly situated to nonprisoners in regard to their entitlement to civil rights protection and the ability to seek redress from the government for civil rights violations. This inquiry requires consideration of whether plaintiffs are similar to nonprisoners "in all relevant respects," but does not require that plaintiffs are identical to nonprisoners in all respects. See *Nordlinger v Hahn,* 505 US 1, 10; 112 S Ct 2326; 120 L Ed 2d 1 (1992) (stating that the Equal Protection Clause "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike").

Although it is axiomatic that prisoners and nonprisoners are not similarly situated in every respect, I would find that, for purposes of the challenged governmental action in this case, they are similarly situated

---

*Scher v Chief Postal Inspector,* 973 F2d 682, 683-684 (CA 8, 1992) (prisoners not similarly situated to nonprisoners for purposes of complaints about mail tampering); *Hrbek v Farrier,* 787 F2d 414, 417 (CA 8, 1986) (prisoners were not similarly situated to nonprisoners with regard to a claim that prison officials' withholding of a portion of wages earned by an inmate on work release).

Lastly, I find the primary Michigan case on which the majority relies, *People v Maxson,* 181 Mich App 133; 449 NW2d 422 (1989), to be distinguishable. Contrary to the majority's conclusions, I find that the entitlement to civil rights while receiving services from the government is markedly different, for constitutional purposes, from a situation concerning whether prisoners and nonprisoners are similarly situated in respect to a prosecutor's decision about whether to prosecute the possession of metallic knuckles. One involves certain rights that are otherwise guaranteed to all, and the other involves the allocation of prosecutorial resources being weighed against internal prison disciplinary decisions.

in all relevant respects. I see no reason why prisoners are any different in regard to their entitlement to a remedy for civil rights violations. Just like nonprisoners, prisoners are interacting with and receiving *at least some level* of services from the government on a regular basis. For instance, prisoners receive food, shelter, protection, discipline, at times medical care, and a host of other benefits from the government. See *Johnson v Wayne Co*, 213 Mich App 143, 152; 540 NW2d 66 (1995) (opinion by JANSEN, J.) ("The Eighth Amendment imposes duties on prison officials to provide humane conditions of confinement, ensure that inmates receive adequate food, shelter, and medical care, and take reasonable measures to guarantee the safety of the inmates.").[15] See also *Neal II*, 232 Mich App at 736-737. Nothing about the nature of their confinement suggests that prisoners should be treated any differently than nonprisoners with regard to civil rights protections. It has never been argued in this case that there are any safety justifications for treating prisoners and nonprisoners differently in regard to their ability to claim protections to civil rights. Nor do any such safety concerns seem apparent in this case. In short, prisoners and nonprisoners are similar with respect to their entitlement to civil rights protections in their interactions with the government. Therefore, I would find that, for purposes of claiming redress for violation of their civil rights, prisoners are similarly situated to nonprisoners in regard to receiving certain benefits and services from the state.

---

[15] In fact, one could argue that the average prisoner has far more encounters with government actors on a daily basis than does the average citizen. Prisoners' entire existence in prison is dependent upon and supported by government actors. Thus, in comparison to nonprisoners, prisoners have far more potential encounters during which they need the protections of the ELCRA.

Defendants argue, and the majority agrees, that because prisoners receive services and benefits from the government involuntarily, by virtue of the fact that their incarceration is not voluntary, they are not similarly situated to nonprisoners. While it is true that, but for involuntary confinement mandated by the state, prisoners would not be inclined to take residence inside prison walls, I do not believe that the involuntary receipt of services changes the equation. That is, I do not agree that those who involuntarily interact with the government are any less deserving of the right to protection of their civil rights and a remedy for violations upon those rights than those who voluntarily do so. To this end, I would note that nearly all citizens are compelled, at times, to receive public services in a manner that is somewhat less than voluntary. For instance, children under a certain age are compelled to attend school,[16] to some degree, yet no one would dispute that children receive public services while they attend public school. Likewise, litigants may be required, subject to the court's contempt powers, to appear at certain court proceedings, but no one would contend that they do not receive public services simply by virtue of the fact that their presence in court was not entirely voluntary. And, for that matter, most trips to the Secretary of State offices are not entirely voluntary. For example, if left to their own accord, most citizens would likely not find it convenient or necessary to register and pay taxes on a newly purchased motor vehicle or boat; rather, they do so because the state requires them to do so. Along a similar vein, prisoners reside in prison and receive certain services therein because the state mandates that they do so. Further-

---

[16] See MCL 380.1561, outlining compulsory school attendance as well as certain exceptions.

more, even assuming that prisoners were the only ones
who received public services in a manner that was less
than voluntary, I fail to see any reason why this
prevents prisoners from being similarly situated to
nonprisoners in regard to their entitlement to civil
rights. Regardless of whether the receipt of services is
voluntary or involuntary, the fact remains that all
citizens are in a position where they expect, rightfully,
to have certain civil rights honored in their respective
dealings with the government.[17] Thus, in my view,
prisoners and nonprisoners are similarly situated with
regard to their entitlement to civil rights in dealings
with the government because, regardless of a person's
abode—either behind bars and concrete blocks or in a
two-story colonial—he or she is still entitled to basic
civil rights that are otherwise guaranteed to all.

### B. RATIONAL BASIS REVIEW

Because I would find that plaintiffs, as prisoners,
are similarly situated to nonprisoners for purposes of
the challenged legislation, the salient inquiry becomes
whether the classification drawn in this case can
withstand rational-basis review. "Under the rational
basis test, the challenged legislation 'is presumed
constitutional, and the party challenging it bears a
heavy burden of rebutting that presumption.' " *Parole*

---

[17] I acknowledge that prisoners do not enjoy all the rights of nonpris-
oners. For example, prisoners are subject to having all telephone calls
and other communications monitored, are subject to searches and
seizures without a warrant, and have various other freedoms curtailed
for purposes of safety and other legitimate reasons. Nevertheless, I do
not believe that this changes the equation. The pertinent analysis
concerns not whether prisoners and nonprisoners are similarly situated
with regard to those freedoms; instead, the analysis concerns whether
the two groups are similarly situated for purposes of seeking redress for
civil rights violations. I see no meaningful reason to treat the groups
differently for that purpose.

*of Hill*, 298 Mich App at 421, quoting *People v Idziak*, 484 Mich 549, 570; 773 NW2d 616 (2009). "Specifically, '[t]o prevail under this highly deferential standard of review, a challenger must show that the legislation is arbitrary and wholly unrelated in a rational way to the objective of the statute.' " *Parole of Hill*, 298 Mich App at 422, quoting *Idziak*, 484 Mich at 570-571. Rational-basis review "is a paradigm of judicial restraint" and "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Fed Communications Comm v Beach Communications, Inc*, 508 US 307, 313; 113 S Ct 2096; 124 L Ed 2d 211 (1993). Indeed, rational-basis review acknowledges that

> [m]ost laws classify, and many affect certain groups unevenly, even though the law itself treats them no differently from all other members of the class described by the law. When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern. [*Personnel Admin of Massachusetts v Feeney*, 442 US 256, 271-272; 99 S Ct 2282; 60 L Ed 2d 870 (1979).]

Nevertheless, the United States Supreme Court has cautioned, "even the standard of rationality as we so often have defined it must find some footing in the realities of the subject addressed by the legislation." *Heller v Doe*, 509 US 312, 321; 113 S Ct 2637; 125 L Ed 2d 257 (1993). "The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne, Texas v Cleburne Living Ctr*, 473 US 432, 446; 105 S Ct 3249; 87 L Ed 2d 313 (1985). When a right is afforded, "it cannot be granted to some litigants and capriciously or arbitrarily denied to others without violating the Equal Protection Clause." *Lindsey v Normet*, 405 US 56, 77; 92 S Ct 862;

31 L Ed 2d 36 (1972). "Furthermore, some objectives—such as a bare desire to harm a politically unpopular group—are not legitimate state interests." *City of Cleburne*, 473 US at 446-447 (citation, quotation marks, and ellipsis omitted). See also *United States v Windsor*, 570 US ___; 133 S Ct 2675, 2693; 186 L Ed 2d 808 (2013); *US Dep't of Agriculture v Moreno*, 413 US 528, 534; 93 S Ct 2821; 37 L Ed 2d 782 (1973).

### C. THE CHALLENGED LEGISLATION LACKS A RATIONAL BASIS

Even under the deferential rational-basis standard, I would hold that the classification drawn in this case, which prevents prisoners, but no one else, from seeking relief under the ELCRA, violates equal protection. Like the court in *Mason v Granholm*, unpublished opinion of the United States District Court for the Eastern District of Michigan, issued January 23, 2007 (Docket No. 05-73943),[18] my reasoning on this issue is guided by the Supreme Court's decision in *Romer v Evans*, 517 US 620; 116 S Ct 1620; 134 L Ed 2d 855 (1996). At issue in *Romer* was an amendment to the Colorado Constitution, "Amendment 2," which prohibited all legislative, executive, or judicial action at any level of state or local government designed to protect homosexual individuals. *Id.*, 517 US at 623-624. The Court held that Amendment 2 failed rational-basis review for two reasons. First, "the amendment has the peculiar property of imposing a broad and undifferentiated disability on a single named group, an exceptional and, as we shall explain, invalid form of legisla-

---

[18] Plaintiffs argue that this Court is bound by the decision in *Mason*. I believe the majority accurately concludes that we are not bound by an unpublished federal district court decision. The majority also correctly concludes that the application of offensive nonmutual collateral estoppel is not appropriate in this case.

tion." *Id.* at 632. The amendment was "at once too narrow and too broad. It identifies persons by a single trait and then denies them protection across the board." *Id.* at 633. The Court explained that "[e]qual protection of the laws is not achieved through indiscriminate imposition of inequalities." *Id.* (citations and quotation marks omitted).

> Respect for this principle explains why laws singling out a certain class of citizens for disfavored legal status or general hardships are rare. A law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense. [*Id.*]

As for the second reason identified by the *Romer* Court for concluding that Amendment 2 failed rational-basis review, the Court found that the "sheer breadth" of the amendment was "so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects . . . ." *Id.* at 632. If the concept of equal protection was to mean anything, reasoned the Court, " 'it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest.' " *Id.* at 634, quoting *Moreno,* 413 US at 534. The classification in that case could not be explained by any of the proffered rationales; thus, Amendment 2 did not bear a rational relationship to a legitimate governmental purpose. *Romer,* 517 US at 635.

Similarly, where the 1999 amendment falls short is that it paints with far too broad a brush. It targets a specific group—prisoners—and prevents that group, and only that group, from filing claims under the ELCRA. As recognized in *Romer,* 517 US at 633,

"[c]entral both to the idea of the rule of law and to our own Constitution's guarantee of equal protection is the principle that government and each of its parts remain open on impartial terms to all who seek its assistance." It is for that reason that a law singling out a particular class and imposing hardships on that class "is itself a denial of equal protection of the laws in the most literal sense." *Id.* Here, the law imposes a hardship—no statutory relief for civil rights violations—on only one group. The decision to single out this particular group and categorically deny prisoners, and only prisoners, the ability to seek relief renders the constitutionality of the 1999 amendment doubtful from the onset. See *id.*

Further, just as in *Romer*, this targeted classification bears no rational relationship to a legitimate governmental interest. Two primary rationales have been advanced for justifying the classification at issue: (1) maintaining prison order and (2) preventing frivolous actions and preserving the public fisc. As to the first proffered rationale, I agree with the majority's conclusion that there is no merit to defendants' assertion that the challenged statute is rationally related to the legitimate governmental interest of prison order and management. There does not appear to be any connection between limiting a prisoner's ability to seek relief under the ELCRA and maintaining prison order.

Where I diverge from the majority opinion is in the conclusion that the second offered purpose— deterrence of frivolous and meritless lawsuits and maintaining the public fisc—does not suffice as a rational basis in this case. There is no doubt that deterring frivolous lawsuits is designed to and does protect the public fisc, and that doing so is a legitimate government purpose. See *Barlett v North Ottawa Comm Hosp*, 244 Mich App 685, 695; 625 NW2d 470

(2001) ("Deterring the filing of frivolous lawsuits against any party or group is a legitimate governmental interest."). Also, it is well established that prisoners, as a group, tend to file more litigation than nonprisoners. See, e.g., *Johnson v Daley*, 339 F3d 582, 592 (CA 7, 2003). The proper inquiry is whether the ends in this case legally justify the means. In other words, is the connection between preventing frivolous lawsuits by prisoners and maintaining the public fisc and the decision to deny an identifiable class of individuals protections under the ELCRA—an act designed to protect the civil rights of all persons—so attenuated that the classification is arbitrary? Given the sweeping prohibitions drawn by the classification at issue and that it completely severs the rights of inmates to seek redress for violations of civil rights— rights which are regarded as those that should be given the "highest priority," in terms of protection, see *Barczak v Rockwell Int'l Corp*, 68 Mich App 759, 763; 244 NW2d 24 (1976)—I find the restriction arbitrary and contrary, if not repugnant, to the ideals of equal protection. The only discernible purpose of the 1999 amendment is to snuff out all lawsuits filed by prisoners.

Indeed, rather than targeting frivolous claims, the only purpose of the 1999 amendment is the elimination of prisoners' ability to bring claims of *any kind* under the ELCRA and to limit the state's liability in civil rights claims by prisoners. This cannot serve as a legitimate government purpose. See *Johnson*, 339 F3d at 612 (Rovner, J., dissenting) (addressing the federal PLRA) ("The government . . . does not and cannot argue that Congress has a legitimate interest in discouraging meritorious litigation by inmates."). See also *Rodriguez v Brand West Dairy*, 2015 NM App 097; 356 P3d 546 (2015) (holding that a New Mexico statute

that excluded farm and ranch laborers from the scope of
workers' compensation coverage violated equal protec-
tion because the classification drawn was arbitrary and
not rationally related to the goal of preserving re-
sources); *Willoughby v Washington Dep't of Labor
& Indus*, 147 Wash 2d 725, 737; 57 P3d 611 (2002)
(invalidating, on equal protection grounds, a statute
that barred the distribution of industrial insurance
permanent partial disability benefits to prisoners be-
cause the statute was unrelated to a legitimate govern-
mental purpose and "saving money is not a sufficient
ground for upholding an otherwise unconstitutional
statute in any event"). There is simply no effort in the
1999 amendment to target frivolous claims; rather, the
amendment is a blunt and obtuse prohibition on all
claims, regardless of merit, under the ELCRA. Although
"equal protection analysis does not require that every
classification be drawn with precise 'mathematical
nicety,' " the classification drawn in this case is more
than merely imprecise, "it is wholly without any ratio-
nal basis." *Moreno*, 413 US at 538. See also *Mason*,
unpub op at 7 (concluding that the 1999 ELCRA amend-
ment was "too broad to be rationally related to" the
asserted governmental interests of "deterring frivolous
suits and protecting the public treasury"). In my view,
the 1999 amendment's "sheer breadth is so discontinu-
ous with the reasons offered for it that the amendment
seems inexplicable by anything but animus toward the
class it affects; it lacks a rational relationship to legiti-
mate state interests." *Romer*, 517 US at 632.[19]

---

[19] The majority cites cases such as *Morales*, 260 Mich App at 52
(holding that legislation precluding prisoners from appealing the deci-
sion of the parole board was rationally related to the legitimate
governmental interest in saving funds in response to frivolous requests
by prisoners), and *Proctor*, 248 Mich App at 469 (no equal protection

In addition, I find it significant that, independent of the 1999 amendment, the Legislature had already enacted several, more targeted statutes designed to ferret out frivolous prison litigation. These more targeted statutes are found in the PLRA, and include, among others, the pleading requirements discussed in Part I of this opinion, MCL 600.5507; the exhaustion of

violation in the Legislature's decision to single out incarcerated prisoners with regard to FOIA exclusions, based on the conclusion that prisoners often file frivolous requests). I find these cases to be unavailing. Initially, the rational-basis analysis in both cases was rather cursory, as *Proctor*, 248 Mich App at 469, summarily concluded "that the Legislature's FOIA exclusions singling out incarcerated prisoners rationally relate to the Legislature's legitimate interest in conserving the scarce governmental resources squandered responding to frivolous FOIA requests by incarcerated prisoners." The pertinent analysis in *Morales* was similarly short, as the opinion cited *Proctor* and concluded that "the exclusion of prisoners' ability under MCL 791.234 to appeal parole denials is rationally related to the Legislature's legitimate interest in saving public funds in response to innumerable frivolous requests by incarcerated prisoners for the review of the Parole Board's denials of parole." *Morales*, 260 Mich App at 52. Moreover, the statutes at issue in both cases were significantly different from the 1999 amendment to the ELCRA. Notably, the ELCRA places an outright ban on *all* prisoner actions under the ELCRA, a ban that is contrary to the constitutional directive contained in Const 1963, art 1, § 2. By contrast, *Morales* dealt with parole, which is not a right to which prisoners are entitled. And the prisoners in *Morales* were afforded *at least some* review of their parole eligibility, as the parole board had to first make a determination as to eligibility; here, by comparison, the 1999 amendment cuts off all review from the outset. As to *Proctor*, I would not consider the denial of a FOIA request to be of the same importance as the denial of an individual's ability to seek redress for a violation of constitutionally guaranteed civil rights. Moreover, I would note that the existence of the PLRA makes the instant case different from both *Morales* and *Proctor*. That is, the PLRA is already a targeted attempt at curtailing frivolous prisoner litigation with regard to prison conditions. The statutes at issue in *Morales* and *Proctor* lacked this type of aggressive safeguard against frivolous actions. Thus, unlike the statutes at issue in *Morales* and *Proctor*, the likelihood that the 1999 amendment was rationally related to the asserted interest of curtailing frivolous actions is significantly lessened.

administrative remedies, MCL 600.5503(1); and various screening provisions that call for dismissal set forth in the PLRA, including those that impose a duty on courts to review complaints and dismiss frivolous claims, such as MCL 600.5503(2), MCL 600.5505(2), and MCL 600.5509(1) and (2), as well as the list maintained by the state court administrator's office of the frivolous civil actions brought by prisoners concerning prison conditions, MCL 600.5529. "The existence of these provisions necessarily casts considerable doubt upon the proposition" that the 1999 amendment "could rationally have been intended to prevent those very same" concerns. See *Moreno*, 413 US at 536-537 (explaining that where other safeguards in the Food Stamp Act already existed, the challenged provision, which excluded from eligibility for food stamps those individuals who resided with nonrelatives, was not rationally related to a legitimate governmental purpose and instead was arbitrary). Given the existence of the much more targeted safeguards in the PLRA, it is dubious whether the 1999 amendment was intended to target frivolous claims.

Defendants attempt to rationalize the prohibition placed on prisoners' abilities to bring claims under the ELCRA by arguing that prisoners can still seek injunctive and declaratory relief under the Constitution for civil rights violations; therefore, according to defendants, the classification is permissible. At first glance, this argument has some appeal, but upon further inquiry, it is found to be wanting.[20] The argument removes the focus from the proper inquiry in this case.

[20] I also note that from a practical standpoint, prisoners who cannot afford to fund their own lawsuit seeking declaratory or injunctive relief would be hard-pressed to find anyone but a pro bono or nonprofit attorney willing to take their case; other than pursuing a case *in propria persona*, the lack of financial redress effectively limits a prisoner's

The pertinent inquiry is not concerned with what *other* avenues of relief are available to prisoners. Rather, the salient concern focuses on the classification drawn in the statute at issue and whether that classification is wholly arbitrary or whether it is rationally related to a legitimate governmental interest. See *Baxstrom v Herold*, 383 US 107; 86 S Ct 760; 15 L Ed 2d 620 (1966) (focusing on the classification drawn, not external concerns).[21] And, as noted earlier, I would conclude that the classification is not rationally related to a legitimate governmental interest.

I find the classification drawn in this case particularly troubling in light of the constitutional mandate established in Const 1963, art 1, § 2, which is emphasized and discussed in detail in Part II of this opinion. The Constitution prohibits discrimination against "any person," and requires the Legislature to implement that directive. In enacting the 1999 amendment at issue, the Legislature, rather than honoring that man-

---

access to the courthouse in seeking to enforce his or her constitutional rights. And again, it is only prisoners who are carved out from relief under the ELCRA.

[21] I find it particularly troubling that the Legislature would choose to preclude monetary relief for something as significant as civil rights violations. Civil rights actions have long been recognized as significant, not only for the litigants but for the public at large. See, e.g., *Rivera*, 477 US at 574. Not only that, but a damages remedy has been recognized as an integral component of remedying civil rights violations. See *Owen v City of Independence, Mo*, 445 US 622, 651; 100 S Ct 1398; 63 L Ed 2d 673 (1980) ("A damages remedy against the offending party is a vital component of any scheme for vindicating cherished constitutional guarantees, and the importance of assuring its efficacy is only accentuated when the wrongdoer is the institution that has been established to protect the very rights it has transgressed."); *Davis v Passman*, 442 US 228, 245; 99 S Ct 2264; 60 L Ed 2d 846 (1979). Further, damages have been recognized as "particularly beneficial" in cases such as this one that allege "those 'systemic' injuries that result not so much from the conduct of any single individual, but from the interactive behavior of several government officials . . . ." *Owen*, 445 US at 652.

date as to "any person," has spurned an identifiable group of individuals. The mandate did not say "all to whom you feel like giving the privilege"; it said "all" without limitation. In this respect, the legislation is nothing but a targeted curtailment of the rights of prisoners to seek the very same relief that all others enjoy. This targeted curtailment of the right of prisoners to seek the very same relief that is available to all others appears, in my mind, so incongruous with the purpose of legislation that was designed to protect civil rights that it is capricious and unrelated to any legitimate governmental purpose. See *Windsor*, 570 US at ___; 133 S Ct at 2693, quoting *Moreno*, 413 US at 534 ("The Constitution's guarantee of equality 'must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot' justify disparate treatment of that group."); *Moreno*, 413 US at 534 ("For if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest."). See also *Mason*, unpub op at 7-8 (noting that "[t]he ELCRA amendment denies prisoners the basic protections against discrimination that all others are afforded under Michigan law, *as required by*" Const 1963, art 1, § 2, and concluding that "[t]here is no rational basis for denying *all* prisoners . . . — and no one else — the ability to seek redress for illegal discrimination that occurred in prison"). Thus, in addition to demonstrating that the 1999 amendment is unconstitutional because it contravenes the Legislative mandate, the betrayal of the mandate also illustrates the capriciousness of the amendment, thereby eroding the asserted rational basis for the legislation.

I am also troubled by the implications of the majority's decision. The 1999 amendment provides no avenue for monetary relief, and, potentially, no redress whatsoever under state law for any type of discrimination not articulated in Const 1963, art 1, § 2, e.g., discrimination based on age, sexual orientation, marital status, or gender. With no threat of a monetary judgment, or, perhaps in some cases, any judgment at all, no state law would stand in the way of prisons and prison officials intentionally discriminating against prisoners in ways that would be prohibited in all other walks of life. For instance, the majority's decision would provide no remedy under state law if prison officials, with no consideration of security concerns or other penological interests, simply denied certain services or benefits, such as educational classes, exercise time, or countless others, to certain classifications of prisoners. And, for that matter, there would be no damages available under the ELCRA if prison officials drew those classifications based on prisoners' race. And the majority's decision would provide no remedy under state law against sexual harassment—a type of sexual discrimination, per MCL 37.2103(i), under the ELCRA. In other words, prison guards and other officials could perpetuate sexual harassment that would, in all other walks of life, be unquestionably banned by the ELCRA, and, by some twisted sense of irony, be insulated from liability under state law by the very same act. As pointed out by plaintiffs, the 1999 amendment only applies to those serving a sentence of imprisonment. Thus, guards and prison officials could sexually harass inmates and face no liability under state law, but face liability under the ELCRA for the very same conduct if it were committed against a visitor to the prison, rather than an inmate. The simple, arbitrary fact that one victim in this scenario wore an orange jumpsuit

and the other wore street clothes would insulate the guards and prison officials under the ELCRA. This, in my mind, highlights the capricious nature of the 1999 amendment and why it cannot withstand even the most deferential rational-basis review. See *City of Cleburne*, 473 US at 446 ("The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."). See also *Baxstrom*, 383 US at 115 ("The capriciousness of the classification employed by the State is thrown sharply into focus by the fact that the" benefit at issue was withheld only in regard to certain incarcerated individuals). The ELCRA, an act designed to protect civil rights, should not be used as a safe harbor against claims of sex discrimination—or any type of discrimination for that matter.

The implications of the majority's decision are even more troubling in light of the fact that it would completely bar, regardless of the merits of the case, any liability on the part of the state for the conduct alleged in this case, which was an ongoing and well-documented problem.[22] The conduct alleged in this case, sexual assaults committed against young inmates, is not a new or unheard-of problem. The federal Prison Rape Elimination Act (PREA), 42 USC 15601(4), enacted in 2003, expressly recognized this very issue, stating that "[y]oung first-time offenders are at increased risk of sexual victimization. Juveniles are 5 times more likely to be sexually assaulted in adult rather than juvenile facilities—often within the first 48 hours of incarceration." While, for the past 12 years, the federal government has been aware of and attempting to eradicate the very problem alleged to

---

[22] This should not be viewed as a substantive evaluation of the merits of plaintiffs' claims in the instant case.

have occurred in this case—the sexual assault of juvenile prisoners—Michigan has been trying to eliminate the rights of juveniles—and other prisoners—to seek monetary relief for this and other civil rights violations. I cannot, in good conscience, countenance this attempt at shirking liability and responsibility.

In sum, although I find that the issue need not be reached because the unconstitutionality of the 1999 amendment is apparent for the reasons discussed in Part II of this opinion, I would conclude that the amendment violates equal protection because it draws a classification between similarly situated individuals and that classification is not rationally related to a legitimate governmental interest.

### IV. REMAINING ARGUMENTS

Lastly, defendants argue that the trial court should have granted their motion for summary disposition under MCR 2.116(C)(8), claiming that plaintiffs failed to adequately allege that they had notice of the conduct at issue.[23] This Court reviews de novo motions for summary disposition. *Citimortgage, Inc v Mtg Electronic Registration Sys, Inc*, 295 Mich App 72, 75; 813 NW2d 332 (2011). Summary disposition is proper under MCR 2.116(C)(8) if "[t]he opposing party has failed to state a claim on which relief can be granted." A motion under MCR 2.116(C)(8) "tests the legal sufficiency of the complaint on the allegations of the pleadings alone." *Feyz v Mercy Mem Hosp*, 475 Mich 663,

---

[23] Defendants raised this argument before the trial court, but the court did not rule on the matter. Because the issue was preserved by virtue of defendants having raised it before the trial court, see *Klooster v Charlevoix*, 488 Mich 289, 310; 795 NW2d 578 (2011), and because I would remand for dismissal without prejudice, see Part I of this opinion, I find it necessary to weigh in on defendants' argument.

672; 719 NW2d 1 (2006). A reviewing court on a (C)(8) motion "must accept as true all factual allegations supporting the claim, and any reasonable inferences or conclusions that might be drawn from those facts." *Gorman v American Honda Motor Co, Inc*, 302 Mich App 113, 131; 839 NW2d 223 (2013). In addition, a court must construe all well-pleaded allegations in a light most favorable to the nonmoving party. *Johnson v Pastoriza*, 491 Mich 417, 435; 818 NW2d 279 (2012). "A motion under MCR 2.116(C)(8) may be granted only when the claims alleged are so clearly unenforceable as a matter of law that no factual development could possibly justify recovery." *Id.* (citation and quotation marks omitted).

Plaintiffs brought claims under the ELCRA against defendant for sex discrimination (hostile environment) and age discrimination. Defendants do not address plaintiffs' claims individually; instead, they argue that plaintiffs' claims must fail because they lacked notice of the alleged harassment. In addition, defendants' arguments only appear to pertain to plaintiffs' claims about sex discrimination. Accordingly, I only evaluate defendants' arguments as to the claims of sex discrimination.

Under the ELCRA, discrimination on the basis of sex, which includes, by definition, sexual harassment, is prohibited. MCL 37.2103(i). The act defines sexual harassment to include

> unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature under the following conditions:
>
> (*i*) Submission to the conduct or communication is made a term or condition either explicitly or implicitly to obtain employment, public accommodations or public services, education, or housing.

(*ii*) Submission to or rejection of the conduct or communication by an individual is used as a factor in decisions affecting the individual's employment, public accommodations or public services, education, or housing.

(*iii*) The conduct or communication has the purpose or effect of substantially interfering with an individual's employment, public accommodations or public services, education, or housing, or creating an intimidating, hostile, or offensive employment, public accommodations, public services, educational, or housing environment. [MCL 37.2103(i).]

The last category is at issue in this case; this type of harassment "is commonly labeled hostile environment harassment." *Chambers v Trettco, Inc*, 463 Mich 297, 310; 614 NW2d 910 (2000).

To establish hostile environment harassment, a plaintiff in a case such as this one must prove:

(1) the [plaintiff] belonged to a protected group;

(2) the [plaintiff] was subjected to communication or conduct on the basis of sex;

(3) the [plaintiff] was subjected to unwelcome sexual conduct or communication;

(4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the [plaintiff's public services or created a hostile environment with regard to those public services]; and

(5) respondeat superior. [*Radtke v Everett*, 442 Mich 368, 382-383; 501 NW2d 155 (1993).]

At issue in this case is the fifth element, respondeat superior. Plaintiffs seek to hold defendants vicariously liable for acts committed by their respective agents. In a hostile environment claim, an employer may avoid liability for hostile environment harassment if, upon notice of the alleged harassment, it adequately investigated and took prompt and appropriate remedial

action. *Id.* at 396. Thus, a defendant must have actual or constructive notice of the alleged harassment before liability will attach. *Sheridan v Forest Hills Pub Schs*, 247 Mich App 611, 621; 637 NW2d 536 (2001). A plaintiff can demonstrate notice if he or she complained to "higher management" about the harassment, or "by showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge." *Id.* (citation and quotation marks omitted). "[N]otice of sexual harassment is adequate if, by an objective standard, the totality of the circumstances were such that a reasonable employer would have been aware of a substantial probability that sexual harassment was occurring." *Chambers*, 463 Mich at 319.

Taking the allegations raised in plaintiffs' complaint as true and construing them in a light most favorable to plaintiffs, as is required under MCR 2.116(C)(8) review, see *Johnson*, 491 Mich at 435; *Gorman*, 302 Mich App at 131, I would find that defendants were not entitled to summary disposition because factual development could possibly justify recovery on plaintiffs' sexual harassment claims. Most notably, I find that because of the pervasiveness of the harassment and sexual violence alleged, plaintiffs sufficiently pleaded knowledge on the part of defendants that a hostile environment existed at each of the facilities. Plaintiffs raised numerous allegations of abuse at all of the correctional facilities. These allegations included claims that some of the plaintiffs were repeatedly and continuously harassed and sexually assaulted by adult male prisoners. Some plaintiffs were harassed and assaulted at multiple Michigan Department of Corrections (MDOC) facilities following transfers. According to plaintiffs' complaint, some of the assaults and harassment occurred in front of MDOC staff members

and were even facilitated at times by MDOC staff opening cell doors to allow prisoners to commit the assaults. The complaint alleged that the assaults were committed in an open and obvious manner, and that there was medical evidence documenting some of the sexual assaults. All of this is in addition to the fact that the complaint alleged that some of the complained-of sexual assaults were perpetrated by MDOC staff members or that MDOC staff members threatened to help facilitate sexual assault against plaintiffs as punishment. These facts, taken in a light most favorable to plaintiffs, show widespread, pervasive sexual assaults at several MDOC facilities.

Furthermore, regarding the harassment perpetrated by adult male prisoners, all of which was alleged to have occurred between the fall of 2010 and December 2013, plaintiffs alleged that the MDOC placed prisoners between the ages of 14 and 17 in adult prisons and that it maintained a policy of placing 17-year-old prisoners in cells with adult prisoners. Plaintiffs also alleged that the MDOC failed to separate juvenile prisoners from adult prisoners in various situations and places, including showers, yards, and eating areas. All of this, despite the fact that the PREA, which was enacted in 2003, was expressly designed to prevent youthful inmates from being "placed in a housing unit in which the youthful inmate will have sight, sound, or physical contact with any adult inmate through use of a shared dayroom or other common space, shower area, or sleeping quarters." 28 CFR 115.14(a). Given the directives of the PREA and the allegations that defendants took actions that were contrary to those directives, combined with the pervasiveness of the alleged harassment, I find that plaintiffs sufficiently pleaded facts to establish that defendants had knowledge or should have had knowledge of

a hostile environment in all 10 facilities at issue. See *Chambers*, 463 Mich at 319; *Sheridan*, 247 Mich App at 621. Plaintiffs are not, as defendants contend, trying to hold defendants "strictly liable" for the alleged sexual assaults. Rather, they are, as is demonstrated by their numerous allegations, attempting to hold defendants liable for failing to remedy a hostile environment—an environment that defendants either knew about or should have known about—based on the facts alleged. Defendants were not entitled to summary disposition under MCR 2.116(C)(8). See *Johnson*, 491 Mich at 435.

V. CONCLUSION

Because I am bound by existing precedent interpreting the PLRA, I concur with the majority in regard to the issue of whether dismissal was required under MCL 600.5507(3), although dismissal would be without prejudice. In all other respects, I respectfully dissent from the majority decision. I would affirm the trial court's declaration that the 1999 amendment to the ELCRA is unconstitutional; however, I would do so on the alternative ground that the statutory amendment contravenes the clear and express directive given to the Legislature in Const 1963, art 1, § 2 to protect the civil rights of all persons. I would also hold that the amendment is unconstitutional because it fails the rational-basis test. Finally, I would find that plaintiffs pleaded sufficient claims to survive a motion for summary disposition under MCR 2.116(C)(8).